WASHINGTON ET AL. *v.* CONFEDERATED TRIBES OF THE COLVILLE INDIAN RESERVATION ET AL.

No. 78–630.   Argued October 9, 1979—Decided June 10, 1980*

---

*Together with *Washington* v. *United States et al.*, also on appeal from the same court, and No. 78–60, *Confederated Tribes of the Colville Indian Reservation et al.* v. *Washington,* also on appeal from the same court but not argued.   See n. 32, *infra.*

136

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and STEVENS, JJ., joined; in Parts I, II, III, IV–B (1), IV–D, V, and VI of which BRENNAN and MARSHALL, JJ., joined; in Parts I, II, III, IV (except ·IV–B (2)), and VI of which STEWART, J., joined; and in Parts I, II, III, IV–C, IV–E, and VI of which REHNQUIST, J., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 164. STEWART, J., filed an opinion concurring in part and dissenting in part, *post*, p. 174. REHNQUIST, J., filed an opinion concurring in part, concurring in the result in part, and dissenting in part, *post*, p. 176.

*Slade Gorton*, Attorney General of Washington, argued the cause for appellants. With him on the briefs were *Philip H. Austin*, Deputy Attorney General, *Richard H. Holmquist*, Senior Assistant Attorney General, and *Timothy R. Malone, Larry R. Schreiter*, and *Matthew J. Coyle*, Assistant Attorneys General.

*Steven S. Anderson* argued the cause for appellees Confederated Tribes of the Colville Indian Reservation et al. With

him on the brief were *Robert L. Pirtle* and *Alvin J. Ziontz*.
*James B. Hovis* argued the cause and filed a brief for appellee
Confederated Tribes and Bands of the Yakima Indian Nation.
*Deputy Solicitor General Claiborne* argued the cause for the
United States. With him on the brief were *Solicitor General
McCree, Assistant Attorney General Moorman, Edward J.
Shawaker,* and *Anne S. Almy.*†

MR. JUSTICE WHITE delivered the opinion of the Court.

In recent Terms we have more than once addressed the
intricate problem of state taxation of matters involving
Indian tribes and their members. *Moe* v. *Salish & Koo-
tenai Tribes,* 425 U. S. 463 (1976); *McClanahan* v. *Arizona
State Tax Comm'n,* 411 U. S. 164 (1973); *Mescalero Apache
Tribe* v. *Jones,* 411 U. S. 145 (1973). We return to that
vexing area in the present cases. Although a variety of ques-
tions are presented, perhaps the most significant is whether an
Indian tribe ousts a State from any power to tax on-reserva-
tion purchases by nonmembers of the tribe by imposing its
own tax on the transaction or by otherwise earning revenues
from the tribal business. A three-judge District Court held
for the Tribes. We affirm in part and reverse in part.

---

†Briefs of *amici curiae* urging reversal were filed by *Helena S. Maclay,
Deirdre Boggs,* and *Keith C. Rennie,* Special Assistant Attorneys General,
for the State of Montana; and by *Frederick J. Martone* for the Salt River
Project Agricultural Improvement and Power District et al.

Briefs of *amici curiae* urging affirmance were filed by *L. Lamar Parrish*
for the All Indian Pueblo Council, Inc.; by *Reid Peyton Chambers* and
*Harry R. Sachse* for the Assiniboine and Sioux Tribes of the Fort Peck
Reservation et al.; and by *Charles A. Hobbs, Stephen H. Whilden,* and
*Bertram E. Hirsch* for the National Congress of American Indians, Inc.,
et al.

*Michael Taylor, John H. Clinebell, Jeffrey S. Schuster, Russell W. Busch,*
and *Robert D. Dellwo* filed a brief for the Quinalt Indian Nation et al. as
*amici curiae.*

## I

These cases are here on the State of Washington's appeal from declaratory judgments and permanent injunctions entered by the District Court at the close of consolidated proceedings in two separate cases that raised related issues. 446 F. Supp. 1339 (ED Wash. 1978). The first case, *Confederated Tribes of the Colville Indian Reservation* v. *State of Washington,* Civ. No. 3868, was filed on May 17, 1973, by the Confederated Tribes of the Colville Reservation (Colville), Makah, and Lummi Tribes. The second, *United States of America and Confederated Bands and Tribes of the Yakima Indian Nation* v. *State of Washington,* Civ. No. 3909, was commenced on July 18, 1973, by the United States on behalf of the Confederated Bands and Tribes of the Yakima Indian Nation (Yakima Tribe).[1] In each action, the complainants contended that the State's cigarette and tobacco products taxes[2] could not lawfully be applied to sales by on-reservation tobacco outlets. They sought declaratory judgments to that effect, as well as injunctions barring the State from taking any measures to enforce the challenged taxes. In particular, the plaintiffs sought to enjoin the State from seizing as contraband untaxed cigarettes destined for delivery to their reservations.[3] In the *Colville* case, the Tribes also chal-

---

[1] On April 24, 1974, the Yakima Tribe intervened as a plaintiff in the United States' case. Its complaint appears at App. 149.

[2] The state tobacco products tax, which is imposed on cigars and pipe tobacco pursuant to Wash. Rev. Code, ch. 82.26 (1976), is not before us. The District Court concluded that that tax fell upon the Indian sellers and not upon the non-Indian purchasers. 446 F. Supp. 1339, 1355, n. 15 (ED Wash. 1978). The State did not appeal from this holding, Brief for Appellants in No. 78–630, p. 55, n. 40, and all parties agree that in consequence the tobacco products tax may not be imposed on sales by tribal dealers.

[3] The Tribes also sought damages for interference with their cigarette businesses. The damages issues in both cases were remanded by the three-judge court to a single District Judge. 446 F. Supp., at 1367, 1373.

lenged the State's assumption of civil and criminal jurisdiction over their reservations and, by amended pleadings, attacked the application of the State's vehicle excise taxes to Indian-owned vehicles. The *Yakima* case did not present these latter issues, but it did make a broad attack on the application of the State's general retail sales tax to on-reservation transactions.

From the time of filing, the two cases pursued closely parallel courses. On November 5, 1973, a temporary restraining order against the State's enforcement of the taxing statutes was issued in each. App. 13, 147. Thereafter, because the complaints sought injunctive relief against the enforcement of state statutes, a three-judge District Court was convened pursuant to the then applicable requirement of 28 U. S. C. § 2281 (1970 ed.).[4] On September 6, 1974, the three-judge court issued preliminary injunctions restraining the State from enforcing the challenged taxes against the Tribes. App. 15, 156. There followed extensive discovery,[5] after which the parties to each case reached agreement on pretrial orders setting forth facts and clarifying the issues.

Trial was held in both cases on March 28, 1977, and the three-judge court entered its consolidated decision on February 22, 1978. The court concluded (1) that it had jurisdiction as a three-judge court to consider the issues presented; (2) that the state cigarette tax could not be applied to on-reservation transactions because it was pre-empted by the tribal taxing ordinances and constituted an impermissible interference with tribal self-government; (3) that the state

[4] Although § 2281 was subsequently repealed, Act of Aug. 12, 1976, § 1, 90 Stat. 1119, it was expressly left in place for cases which, like those before us, were pending on the date of repeal. § 7, 90 Stat. 1120. We consider issues concerning the applicability of the former § 2281 to these cases in Part III, *infra*.

[5] Proceedings in both cases were stayed for several months, however, pending this Court's decisions in *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), and *Bryan* v. *Itasca County*, 426 U. S. 373 (1976).

retail sales tax could not be applied to tribal cigarette sales, but could be applied to sales of other goods to non-Indians; (4) that the State could not impose certain recordkeeping requirements in connection with various tax-exempt sales; (5) that the State could not impose its vehicle excise taxes upon vehicles owned by the Tribes and their members; and (6) that the State's assumption of civil and criminal jurisdiction over the Makah and Lummi Tribes was unconstitutional. The court enjoined enforcement of the statutes it had struck down, and the State moved unsuccessfully for a new trial. This appeal followed. We postponed consideration of certain jurisdictional questions to the merits. 440 U. S. 905 (1979).

We begin by sketching the relevant factual background, which is not seriously in dispute.[6] Thereafter, we explore the jurisdictional questions previously postponed and then turn to the merits.

## II

The State of Washington levies a cigarette excise tax of $1.60 per carton,[7] on the "sale, use, consumption, handling, possession or distribution" of cigarettes within the State. Wash. Rev. Code § 82.24.020 (1976). The tax is enforced with tax stamps; and dealers are required to sell only cigarettes to which such stamps have been affixed. § 82.24.030. Indian tribes are permitted to possess unstamped cigarettes for purposes of resale to members of the tribe, but are required by regulation to collect the tax with respect to sales to non-members. § 82.24.260; Wash. Admin. Code § 458–20–192

---

[6] Our statement of the factual background is drawn in large measure from the opinion of the District Court, 446 F. Supp., at 1345–1349, 1368–1370.

[7] The cigarette excise tax is imposed pursuant to Wash. Rev. Code § 82.24.020 (1976). That provision authorizes a levy of 6.5 mills per cigarette. The tax is brought up to its full amount by Wash. Rev. Code §§ 28A.47.440 and 73.32.130 (1976), which add 0.5 mill and 1 mill respectively.

(1977).[8]  The District Court found, on the basis of its examination of state authorities, that the legal incidence of the tax is on the purchaser in transactions between an Indian seller and a non-Indian buyer.[9]

The State has sought to enforce its cigarette tax by seizing as contraband unstamped cigarettes bound for various tribal reservations.  It claims that it is entitled to make such seizures whenever the cigarettes are destined to be sold to non-Indians without affixation of stamps or collection of the tax.

Washington also imposes a sales tax on sales of personal property, including cigarettes.  Wash. Rev. Code § 82.08.020 (1976).  This tax, which was 5% during the relevant period, is collected from the purchaser by the retailer.  § 82.08.050. It does not apply to on-reservation sales to reservation Indians.  Wash. Admin. Code § 458–20–192 (1977).

The state motor vehicle excise tax is imposed on "the privilege of using in the state any motor vehicle."  Wash. Rev. Code § 82.44.020 (Supp. 1977).  The tax is assessed annually, and during the relevant period the amount was 2%

---

[8] Initially the State asserted that it could tax all tribal cigarette sales, regardless of whether the buyer was Indian or non-Indian.  Its theory was that Pub. L. 280, 67 Stat. 588, granted it general authority to tax reservation Indians.  After this theory was rejected in *Bryan* v. *Itasca County, supra,* the State abandoned any claim of authority to tax sales to tribal members.  See 446 F. Supp., at 1346, n. 4.

[9] *Id.,* at 1352–1355.  Essentially, the court accepted the State's contention that the tax falls upon the first event which may constitutionally be subjected to it.  In the case of sales by non-Indians to non-Indians, this means the incidence of the tax is on the seller, or perhaps on someone even further up the chain of distribution, because that person is the one who first sells, uses, consumes, handles, possesses, or distributes the products.  But where the wholesaler or retailer is an Indian on whom the tax cannot be imposed under *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973), the first taxable event is the use, consumption, or possession by the non-Indian purchaser.  Hence, the District Court concluded, the tax falls on that purchaser.  We accept this conclusion.

of the fair market value of the vehicle in question. In addition, the State imposes an annual tax in the amount of 1% of fair market value on the privilege of using campers and trailers in the State. § 82.50.400 (1976).[10]

Each of the Tribes involved in this litigation is recognized by the United States as a sovereign Indian tribe. Each is governed by a business or tribal council approved by the Secretary of the Interior.[11] The Colville Tribe has some 5,800 members, of whom about 3,200 live on the Colville Indian Reservation.[12] Enrolled members of the Tribe constitute just under half of the reservation's population. The Lummi Tribe has approximately 2,000 members. Roughly 1,250 of them live on the reservation.[13] The Makah Tribe has about 1,000 members. Some 900 live on the reservation.[14] The Colville, Lummi, and Makah Reservations are isolated and underdeveloped. Many members reside in mobile homes. Most own at least one automobile which is used both on and off the reservation.

---

[10] The same chapter provided for an excise tax on mobile homes. Initially, the State sought to apply this tax to Indians as well; but after *Bryan* v. *Itasca County*, 426 U. S. 373 (1976), and *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), it no longer attempts to do so. 446 F. Supp., at 1365.

[11] The Makah Tribe is organized under the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* While the Lummi and Colville Tribes do have federally-approved constitutions, they voted in 1935 not to come under that Act. 446 F. Supp., at 1345, n. 2.

[12] The Colville Reservation encompasses 1.3 million acres in the northeastern section of Washington. It was established by Executive Order on July 2, 1872. 1 C. Kappler, Indian Affairs, Laws and Treaties 916 (2d ed. 1904).

[13] The Lummi Reservation encompasses 7,319 acres, most of them on a peninsula near Bellingham, Wash. It was established by the Treaty of Point Elliott in 1855. 12 Stat. 927.

[14] The Makah Reservation encompasses 28,000 acres at the northwest tip of the Olympic Peninsula. It too was established by treaty in 1855. Treaty with the Makah Tribe, 12 Stat. 939. Roughly 63% of its inhabitants are enrolled members of the Tribe.

The Yakima Tribe has more than 6,000 members, of whom about 5,000 live on the reservation.[15] Enrolled members, however, constitute less than one-fifth of the reservation's population. The balance is made up of approximately 1,500 Indians who are not members of the Tribes and more than 20,000 non-Indians.

The Colville, Lummi, and Makah Tribes have nearly identical cigarette sales and taxing schemes. Each Tribe has enacted ordinances pursuant to which it has authorized one or more on-reservation tobacco outlets.[16] These ordinances have been approved by the Secretary of the Interior; and the dealer at each tobacco outlet is a federally licensed Indian trader. All three Tribes use federally restricted tribal funds[17] to purchase cigarettes from out-of-state dealers.[18] The Tribes distribute the cigarettes to the tobacco outlets and collect from the operators of those outlets both the wholesale distribution price and a tax of 40 to 50 cents per carton. The cigarettes remain the property of the Tribe until sale. The taxing ordinances specify that the tax is to be passed on to the ultimate consumer of the cigarettes. From 1972 through 1976, the Colville Tribe realized approximately $266,000 from its cigarette tax; the Lummi Tribe realized $54,000 and the Makah Tribe realized $13,000.

While the Colville, Lummi, and Makah Tribes function as retailers, retaining possession of the cigarettes until their sale to consumers, the Yakima Tribe acts as a wholesaler. It pur-

---

[15] The Yakima Indian Reservation was set aside for the Tribe by treaty ratified March 8, 1859. Treaty with the Yakimas, 12 Stat. 951. It encompasses about 1.4 million acres in south-central Washington.

[16] The tribal ordinances regulating the sale, distribution, and taxing of cigarettes are set forth at App. 104, 118, and 111.

[17] The funds are maintained in individual accounts in the Bureau of Indian Affairs agency serving the reservation pursuant to 25 CFR Part 104 (1978). App. 32–34.

[18] These out-of-state wholesalers are also federally licensed Indian traders.

chases cigarettes from out-of-state dealers and then sells them to its licensed retailers. The Tribe receives a markup over the wholesale price from those retailers as well as a tax of 22.5 cents per carton. There is no requirement that this tax be added to the selling price. In 1975, the Yakima Tribe derived $278,000 from its cigarette business.

Indian tobacco dealers make a large majority of their sales to non-Indians—residents of nearby communities who journey to the reservation especially to take advantage of the claimed tribal exemption from the state cigarette and sales taxes. The purchaser saves more than a dollar on each carton, and that makes the trip worthwhile. All parties agree that if the State were able to tax sales by Indian smokeshops and eliminate that $1 saving, the stream of non-Indian bargain hunters would dry up. In short, the Indian retailer's business is to a substantial degree dependent upon his tax-exempt status, and if he loses that status his sales will fall off sharply.

## III

We first address our jurisdiction to hear the State's appeal. Two attacks are made upon that jurisdiction, one grounded in the intricacies of the now repealed statute governing three-judge district courts and the other having to do with the timing of the State's appeal.

Under 28 U. S. C. § 1253, a direct appeal lies to this Court from an order granting or denying an injunction in a suit "required by any Act of Congress to be heard and determined by a district court of three judges." At the time the *Yakima* and *Colville* cases were filed, 28 U. S. C. § 2281 (1970 ed.) provided that:

> "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . shall not be granted by any district court or judge thereof

upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges. . . ." [19]

After the State filed its jurisdictional statement in this appeal, the United States moved to dismiss the *Yakima* case on the ground that it was not one required by § 2281 to be heard by a court of three judges and thus did not fall within the grant of appellate jurisdiction in § 1253. Although directed only to the *Yakima* case because that is the only one to which the Government is a party, this challenge is quite clearly germane to the *Colville* case as well.

Section 2281 does not require a three-judge court where a constitutional challenge to a state statute is grounded only in the Supremacy Clause. *Swift & Co.* v. *Wickham,* 382 U. S. 111, 128–129 (1965). In addition, § 2281 is not brought into play by constitutional claims that are "insubstantial," *Goosby* v. *Osser,* 409 U. S. 512, 518 (1973). The United States argues that the substantive tax claims raised by these cases fall into one or the other category, and thus failed to trigger § 2281.[20] Further, the Government continues, the attacks on the State's seizure of cigarettes, while perhaps raising genuine Commerce Clause issues, are not properly characterized as challenges to the constitutionality *of a state statute.* Rather, the Government asserts, they go to the constitutionality of the *result* obtained by the *use* of the statute. We find neither contention persuasive.

The original complaints in these actions contended that the state taxes were unconstitutional under the Indian Com-

---

[19] The repeal of this provision in 1976 does not affect its application to these cases. See n. 4, *supra.*

[20] As the Government recognizes, its position in this regard is somewhat anomalous since it was the United States which initially requested a three-judge court in the *Yakima* case. App. 145. At that time the Government seemed to have no doubt that it sought to enjoin the enforcement of a state statute on grounds of its unconstitutionality within the meaning of § 2281.

merce Clause as well as the Supremacy Clause. Relying primarily upon language in footnote 17 in *Moe* v. *Salish & Kootenai Tribes,* 425 U. S., at 481, the United States asserts that the Tribes' Commerce Clause claims were insubstantial.[21] But *Moe* was decided in 1976—long after a three-judge court was convened to hear these cases—and it is thus apparent that footnote 17 alone cannot be dispositive, whatever its precise thrust. There is language in that footnote, however, which suggests that the insubstantiality of Commerce Clause claims such as those before us flows from *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973), and *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973)—both of which were decided before the present suits were filed.[22] We think the United States reads too much into this language. *Goosby* v. *Osser, supra,* made it clear that constitutional claims will not lightly be found insubstantial for

---

[21] The District Court seems to have found this contention persuasive, 446 F. Supp., at 1350, although it addressed it only briefly. Presumably it saw no need to explore the matter more fully since it was confident that the three-judge requirement had in any event been satisfied by the Tribes' challenges to the State's enforcement measures. *Id.,* at 1350–1351.

[22] Footnote 17 in its entirety reads as follows:

"It is thus clear that the basis for the invalidity of these taxing measures, which we have found to be inconsistent with existing federal statutes, is the Supremacy Clause, U. S. Const., Art. VI, cl. 2, and not any automatic exemptions 'as a matter of constitutional law' either under the Commerce Clause or the intergovernmental-immunity doctrine as laid down originally in *M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819). If so, then the basis for convening a three-judge court in this type of case has effectively disappeared, for this Court has expressly held that attacks on state statutes raising only Supremacy Clause invalidity do not fall within the scope of 28 U. S. C. § 2281. *Swift & Co.* v. *Wickham,* 382 U. S. 111 (1965). Here, however, the District Court properly convened a § 2281 court, because at the outset the Tribe's attack asserted unconstitutionality of these statutes under the Commerce Clause, a not insubstantial claim since *Mescalero* and *McClanahan* had not yet been decided. See *Goosby* v. *Osser,* 409 U. S. 512 (1973)." 425 U. S., at 481.

purposes of § 2281. Indeed, *Goosby* explicitly states that prior decisions are not sufficient to support a conclusion that certain claims are insubstantial unless those prior decisions "inescapably render the claims frivolous." 409 U. S., at 518. We cannot say here that the *Goosby* test has been met. Neither *Mescalero* nor *McClanahan* "inescapably render[s] the [Tribes' Commerce Clause] claims frivolous" because neither holds that that Clause is wholly without force in situations like the present. And even footnote 17 merely rejects the stark and rather unhelpful notion that the Commerce Clause provides an *"automatic* exemptio[n] 'as a matter of constitutional law'"* in such cases. (Emphasis added.) It does not take that Clause entirely out of play in the field of state regulation of Indian affairs.

In addition, it seems quite clear that the Tribes' attack on the official seizure of cigarettes bound for the reservations also triggers the three-judge requirement of § 2281. The United States concedes that that attack raised Commerce Clause issues, but maintains that the Tribes' target was not really the state enforcement statutes themselves, but rather the discretionary official conduct undertaken pursuant to those statutes. We have no quarrel with the proposition that the mere fact that executives seek shelter under various state statutes will not necessarily convert a suit to restrain their lawless behavior into a § 2281 case, *Phillips* v. *United States,* 312 U. S. 246, 248–253 (1941). But this is not a situation in which the only connection with state statutes arises when officials accused of taking various ultra vires actions seek to trace their conduct back to vague statutes granting them broad executive discretion. Here the state officials involved were attempting to enforce the state tax laws by using the tools authorized for such enforcement by the state legislature. They manifested an intention to continue to use those tools for that purpose. And it is those tools, as applied to cigarettes in Indian commerce, which the Tribes chal-

lenged.[23]  We hold that this suffices to bring these cases within § 2281.

The other jurisdictional question postponed in 1979 is relevant only to the *Colville* case.  It concerns the timeliness under 28 U. S. C. § 2101 (b) of the State's appeal from the District Court's resolution of the motor-vehicle-tax and assumption-of-jurisdiction issues.  Basically, the problem is this: the notice of appeal on these two issues was filed more than 60 days after the District Court's decision, but within 60 days of the denial of a state motion for partial new trial—a motion that was not addressed to the motor-vehicle-tax and assumption-of-jurisdiction issues.  The question is whether a motion for partial new trial renders nonfinal the District Court's holding on *all* issues between the parties, or merely renders nonfinal the disposition of those issues actually raised in the new trial motion.  If the former, the State's notice of appeal on the vehicle-taxes and assumption-of-jurisdiction issues was timely.  If the latter, that notice was filed out of time and to that extent the appeal is jurisdictionally time-barred.[24]

---

[23] See *Turner* v. *Fouche,* 396 U. S. 346, 354, n. 10 (1970).  See also *Department of Employment* v. *United States,* 385 U. S. 355 (1966); *Query* v. *United States,* 316 U. S. 486, 490 (1942).

[24] The actual chronology was as follows: On May 10, 1978, the District Court entered its final order.  On May 22, the State filed a motion for partial new trial on the cigarette and sales tax issues.  On July 12, while that motion was pending, the State filed a notice of appeal raising the motor-vehicle-excise-tax and assumption-of-jurisdiction issues.  On July 17, the motion for partial new trial was denied; and on August 14, the State filed a notice of appeal on the sales and cigarette tax issues.  On September 8, the State filed an amended notice of appeal raising all relevant issues.  The July 12 notice of appeal was filed more than 60 days after the original District Court order.  Accordingly, under 28 U. S. C. § 2101 (b), it was out of time.  The notice of August 14 and the amended notice of September 8, however, were filed within 60 days of the District Court's denial of the motion for partial new trial.  It seems clear that the filing of that motion rendered nonfinal the disposition of all covered

We think that the filing of a motion for partial new trial in these circumstances must have rendered nonfinal the disposition of all issues between the parties. A contrary conclusion would serve no useful purpose. At best it would make little difference save to force future appellants to include in what might otherwise have been narrow motions for partial new trials a blanket request for reconsideration of all issues. And at worst it would be a procedural pitfall, devoid of any sound supporting rationale but capable of occasionally tripping those who failed to insert a line of boilerplate or file a redundant slip of paper. Accordingly, we hold that the appeal of the District Court's vehicle-tax and assumption-of-jurisdiction holdings is properly before us, and we turn to the merits.

## IV

### A

In *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), we considered a state taxing scheme remarkably similar to the cigarette and sales [25] taxes at issue in the present cases. Montana there sought to impose a cigarette tax on sales by smokeshops operated by tribal members and located on leased trust lands within the reservation, and sought to require the smokeshop operators to collect the tax. We upheld the tax, insofar

---

issues—if not, one seeking a partial new trial would have to jeopardize his right to appeal. *Communist Party of Indiana* v. *Whitcomb*, 414 U. S. 441, 445–446 (1974); *Department of Banking* v. *Pink*, 317 U. S. 264, 266 (1942). Thus, the only remaining question is whether the motion for partial new trial also suspended the finality of the District Court's disposition of issues not covered by that motion.

[25] We are here generally concerned only with the application of Washington's retail sales tax to *cigarette* sales. The District Court upheld the sales tax as applied to sales of other goods to non-Indians, and the Tribes do not contest that holding. We do, however, consider the question of noncigarette sales when we discuss (1) whether Washington can tax purchases by Indians not members of the governing Tribe, and (2) whether Washington's recordkeeping requirements are valid.

as sales to non-Indians were concerned,[26] because its legal inci-
dence fell on the non-Indian purchaser. Hence, "the compet-
itive advantage which the Indian seller doing business on
tribal land enjoys over all other cigarette retailers, within and
without the reservation, is dependent on the extent to which
the non-Indian purchaser is willing to flout *his* legal obligation
to pay the tax." *Id.*, at 482 (emphasis in original). We
upheld the collection requirement, as applied to purchases by
non-Indians, on the ground that it was a "minimal burden"
designed to aid the State in collecting an otherwise valid tax.
*Id.*, at 483.

*Moe* establishes several principles relevant to the present
cases. The State may sometimes impose a nondiscriminatory
tax on non-Indian customers of Indian retailers doing business
on the reservation. Such a tax may be valid even if it seri-
ously disadvantages or eliminates the Indian retailer's busi-
ness with non-Indians.[27] And the State may impose at least
"minimal" burdens on the Indian retailer to aid in enforcing
and collecting the tax. There is no automatic bar, therefore,
to Washington's extending its tax and collection and record-
keeping requirements onto the reservation in the present cases.

Although it narrows the issues in the present cases, *Moe*
does not definitively resolve several important questions.
First, unlike in *Moe,* each of the Tribes imposes its own tax
on cigarette sales, and obtains further revenues by participat-
ing in the cigarette enterprise at the wholesale or retail level.
Second, Washington requires the Indian retailer to keep
detailed records of exempt and nonexempt sales in addition to
simply precollecting the tax. *Moe* expressed no opinion

---

[26] We struck down the tax as applied to sales to Indians. 425 U. S., at
475–481.

[27] The United States reads *Moe* too parsimoniously in asserting its inap-
plicability to cases, such as the present ones, in which the economic
impact on tribal retailers is particularly severe. *Moe* makes clear that
the Tribes have no vested right to a certain volume of sales to non-Indians,
or indeed to any such sales at all.

regarding the "complicated problems" of enforcement that distinctions between exempt and nonexempt purchasers might entail. *Id.*, at 468, n. 6. Third, *Moe* left unresolved the question of whether a State can tax purchases by on-reservation Indians not members of the governing tribe, as Washington seeks to do in the present cases. *Id.*, at 480–481, n. 16. Finally, unlike in *Moe*, Washington has seized, and threatens to continue seizing, shipments of unstamped cigarettes en route to the reservations from wholesalers outside the State. We address each of these questions.

## B

### (1)

At the outset, the State argues that the Colville, Makah, and Lummi Tribes have no power to impose their cigarette taxes on nontribal purchasers.[28] We disagree. The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status. Cf. *United States* v. *Wheeler,* 435 U. S. 313 (1978).

The widely held understanding within the Federal Government has always been that federal law to date has not worked a divestiture of Indian taxing power. Executive Branch officials have consistently recognized that Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest, 17 Op. Atty. Gen. 134 (1881); 7 Op.

---

[28] The incidence of the Colville, Lummi, and Makah taxes falls on the cigarette purchaser, since the tribal ordinances specify that the tax is to be passed on to the ultimate consumer. The Yakima ordinance, in contrast, does not require that the tax be added to the selling price, and the incidence of the Yakima tax therefore does not fall on the purchaser. The State's challenge is directed only at the Colville, Lummi, and Makah taxes.

Atty. Gen. 174 (1855), including jurisdiction to tax, 23 Op. Atty. Gen. 214 (1900); *Powers of Indian Tribes,* 55 I. D. 14, 46 (1934). According to the Solicitor of the Department of the Interior:

> "Chief among the powers of sovereignty recognized as pertaining to an Indian tribe is the power of taxation. Except where Congress has provided otherwise, this power may be exercised over members of the tribe *and over nonmembers,* so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions." *Ibid.* (emphasis added).

Federal courts also have acknowledged tribal power to tax non-Indians entering the reservation to engage in economic activity. *Buster* v. *Wright,* 135 F. 947, 950 (CA8 1905), appeal dism'd, 203 U. S. 599 (1906); *Iron Crow* v. *Oglala Sioux Tribe,* 231 F. 2d 89 (CA8 1956); cf. *Morris* v. *Hitchcock,* 194 U. S. 384, 393 (1904). No federal statute cited to us shows any congressional departure from this view. To the contrary, authority to tax the activities or property of non-Indians taking place or situated on Indian lands, in cases where the tribe has a significant interest in the subject matter, was very probably one of the tribal powers under "existing law" confirmed by § 16 of the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U. S. C. § 476. In these respects the present cases differ sharply from *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191 (1978), in which we stressed the shared assumptions of the Executive, Judicial, and Legislative Departments that Indian tribes could not exercise criminal jurisdiction over non-Indians.

Tribal powers are not implicitly divested by virtue of the tribes' dependent status. This Court has found such a divestiture in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal

consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights. See *id.,* at 208–210; *United States* v. *Wheeler, supra,* at 326. In the present cases, we can see no overriding federal interest that would necessarily be frustrated by tribal taxation. And even if the State's interests were implicated by the tribal taxes, a question we need not decide, it must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.

## (2)

The Tribes contend that their involvement in the operation and taxation of cigarette marketing on the reservation ousts the State from any power to exact its sales and cigarette taxes from nonmembers purchasing cigarettes at tribal smokeshops. The primary argument is economic. It is asserted that smokeshop cigarette sales generate substantial revenues for the Tribes which they expend for essential governmental services, including programs to combat severe poverty and underdevelopment at the reservations. Most cigarette purchasers are outsiders attracted onto the reservations by the bargain prices the smokeshops charge by virtue of their claimed exemption from state taxation. If the State is permitted to impose its taxes, the Tribes will no longer enjoy any competitive advantage vis-à-vis businesses in surrounding areas. Indeed, because the Tribes themselves impose a tax on the transaction, if the state tax is also collected the price charged will necessarily be higher and the Tribes will be placed at a competitive *disadvantage* as compared to businesses elsewhere. Tribal smokeshops will lose a large percentage of their cigarette sales and the Tribes will forfeit substantial revenues. Because of this economic impact, it is argued, the state taxes are (1) pre-empted by federal statutes regulating Indian affairs; (2) inconsistent with the principle of tribal self-government; and (3) invalid under "negative implications" of the Indian Commerce Clause.

It is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest. Cf. *Moe* v. *Salish & Kootenai Tribes*, 425 U. S., at 475–481; *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973). What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation. The Tribes assert the power to create such exemptions by imposing their own taxes or otherwise earning revenues by participating in the reservation enterprises. If this assertion were accepted, the Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom from surrounding areas. We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.

The federal statutes cited to us, even when given the broadest reading to which they are fairly susceptible, cannot be said to pre-empt Washington's sales and cigarette taxes. The Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, the Indian Financing Act of 1974, 88 Stat. 77, 25 U. S. C. § 1451 *et seq.*, and the Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203, 25 U. S. C. § 450 *et seq.*, evidence to varying degrees a congressional concern with fostering tribal self-government and economic development, but none goes so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses in a State. The Indian traders statutes, 25 U. S. C. § 261 *et seq.*, incorporate a congressional desire comprehensively to regulate businesses selling goods to reservation Indians for cash or exchange, see *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965), but no similar intent is evident

with respect to sales by Indians to nonmembers of the Tribe. The Washington Enabling Act, 25 Stat. 676, reflects an intent that the State not tax reservation lands or income derived therefrom, but the present taxes are assessed against nonmembers of the Tribes and concern transactions in personalty with no substantial connection to reservation lands. The relevant treaties, Treaty of Point Elliott, 12 Stat. 927 (1855) (Lummi Tribe); Treaty with the Makah Tribe, 12 Stat. 939 (1855); Treaty with the Yakimas, 12 Stat. 951 (1855), can be read to recognize inherent tribal power to exclude non-Indians or impose conditions on those permitted to enter; but purchasers entering the reservation are not the State's agents and any agreements which they might make cannot bind it. Finally, although the Tribes themselves could perhaps pre-empt state taxation through the exercise of properly delegated federal power to do so, cf. *Fisher* v. *District Court,* 424 U. S. 382, 390 (1976) *(per curiam)*; *United States* v. *Mazurie,* 419 U. S. 544 (1975), we do not infer from the mere fact of federal approval of the Indian taxing ordinances, or from the fact that the Tribes exercise congressionally sanctioned powers of self-government, that Congress has delegated the far-reaching authority to pre-empt valid state sales and cigarette taxes otherwise collectible from nonmembers of the Tribe.

Washington does not infringe the right of reservation Indians to "make their own laws and be ruled by them," *Williams* v. *Lee,* 358 U. S. 217, 220 (1959), merely because the result of imposing its taxes will be to deprive the Tribes of revenues which they currently are receiving. The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other. *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 179. While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value gen-

erated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services. As we have already noted, Washington's taxes are reasonably designed to prevent the Tribes from marketing their tax exemption to nonmembers who do not receive significant tribal services and who would otherwise purchase their cigarettes outside the reservations.

It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes. See *Moe* v. *Salish & Kootenai Tribes, supra,* at 481, n. 17. That Clause may have a more limited role to play in preventing undue discrimination against, or burdens on, Indian commerce. But Washington's taxes are applied in a nondiscriminatory manner to all transactions within the State. And although the result of these taxes will be to lessen or eliminate tribal commerce with nonmembers, that market existed in the first place only because of a claimed exemption from these very taxes. The taxes under consideration do not burden commerce that would exist on the reservations without respect to the tax exemption.

We cannot fault the State for not giving credit on the amount of tribal taxes paid. It is argued that if a credit is not given, the tribal retailers will actually be placed at a competitive disadvantage, as compared to retailers elsewhere, due to the overlapping impact of tribal and state taxation. While this argument is not without force, we find that the Tribes have failed to demonstrate that business at the smokeshops would be significantly reduced by a state tax without a credit as compared to a state tax with a credit. With a credit, prices at the smokeshops would presumably be roughly the same as those off the reservation, assuming that the Indian enterprises are operated at an efficiency similar to that of businesses

elsewhere; without a credit, prices at smokeshops would exceed those off the reservation by the amount of the tribal taxes, about 40 to 50 cents per carton for the Lummi, Makah, and Colville Tribes, and 22.5 cents per carton for the Yakima Tribe. It is evident that even if credit were given, the bulk of the smokeshops' present business would still be eliminated, since nonresidents of the reservation could purchase cigarettes at the same price and with greater convenience nearer their homes and would have no incentive to travel to the smokeshops for bargain purchases as they do now. Members of the Tribes, of course, would be indifferent to whether a credit were given because under *Moe* they are immune from any state tax, whether credited or not. Some nonmembers of the Tribes living on the reservations would possibly travel elsewhere to purchase cigarettes if a state credit were not given, and smokeshop business would to this extent be decreased as compared to the situation under a credited tax. But the Tribes have not shown whether or to what extent this would be the case, and we cannot infer on the present record that by failing to give a credit Washington impermissibly taxes reservation value by deterring sales that, if credit were given, would occur on the reservation because of its location and because of the efforts of the Tribes in importing and marketing the cigarettes.

A second asserted ground for the invalidity of the state taxes is that they somehow conflict with the Tribes' cigarette ordinances and thereby are subject to pre-emption or contravene the principle of tribal self-government. This argument need not detain us. There is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other. Although taxes can be used for distributive or regulatory purposes, as well as for raising revenue, we see no nonrevenue purposes to the tribal taxes at issue in these cases, and, as already noted, we perceive no intent on the part of Congress to authorize the Tribes to pre-empt otherwise valid state taxes. Other provi-

sions of the tribal ordinances do comprehensively regulate the marketing of cigarettes by the tribal enterprises; but the State does not interfere with the Tribes' power to regulate tribal enterprises when it simply imposes its tax on sales to non-members. Hence, we perceive no conflict between state and tribal law warranting invalidation of the State's taxes.

## C

We recognized in *Moe* that if a State's tax is valid, the State may impose at least minimal burdens on Indian businesses to aid in collecting and enforcing that tax. The simple collection burden imposed by Washington's cigarette tax on tribal smokeshops is legally indistinguishable from the collection burden upheld in *Moe,* and we therefore hold that the State may validly require the tribal smokeshops to affix tax stamps purchased from the State to individual packages of cigarettes prior to the time of sale to nonmembers of the Tribe.

The state sales tax scheme requires smokeshop operators to keep detailed records of both taxable and nontaxable transactions. The operator must record the number and dollar volume of taxable sales to nonmembers of the Tribe. With respect to nontaxable sales, the operator must record and retain for state inspection the names of all Indian purchasers, their tribal affiliations, the Indian reservations within which sales are made, and the dollar amount and dates of sales. In addition, unless the Indian purchaser is personally known to the operator he must present a tribal identification card.

The District Court struck down all recordkeeping requirements with respect to cigarette sales, because it found that no cigarette sales were taxable. With respect to sales of items other than cigarettes, the District Court found no record evidence "as to whether the record keeping requirements, as promulgated, are or are not reasonably necessary to ensure payment of lawful taxes." 446 F. Supp., at 1373. The District Court upheld the requirements insofar as they pertained to taxable sales, but struck them down with respect to non-

taxable sales on the ground that the State had not met its burden of showing that the regulation was reasonably necessary to ensure payment of taxes which it had power to impose.

Contrary to the District Court, we find the State's record-keeping requirements valid *in toto*. The Tribes, and not the State as the District Court supposed, bear the burden of showing that the recordkeeping requirements which they are challenging are invalid. The District Court made the factual finding, which we accept, that there was no evidence of record on this question. Applying the correct burden of proof to the District Court's finding, we hold that the Tribes have failed to demonstrate that the State's recordkeeping requirements for exempt sales are not reasonably necessary as a means of preventing fraudulent transactions.

### D

The State asserts the power to apply its sales and cigarette taxes to Indians resident on the reservation but not enrolled in the governing Tribe. The issue arose in the *Yakima* case in the wake of the District Court's determination that the state retail sales tax could be applied to the purchase by non-Indians of goods other than cigarettes. It was, of course, quite clear after *Moe* and *McClanahan* that the sales tax could not be applied to similar purchases by tribal members, but the State argued that this exemption should not extend to non-members of the Tribe. Relying in part on the lower court opinion in *Moe, Confederated Salish & Kootenai Tribes* v. *Moe,* 392 F. Supp. 1297, 1312 (Mont. 1975) (three-judge court), the District Court rejected the contention. 446 F. Supp., at 1371–1372. This Court did not reach the question in *Moe* because Montana failed to raise it on appeal. We do reach it now, and we reverse.

Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. We do not so read the Major Crimes Act,

18 U. S. C. § 1153, which at most provides for federal-court jurisdiction over crimes committed by Indians on another Tribe's reservation. Cf. *United States* v. *Antelope*, 430 U. S. 641, 646–647, n. 7 (1977). Similarly, the mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U. S. C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.

Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes.

## E

Finally, the State contends that it has the power to seize unstamped cigarettes as contraband if the Tribes do not cooperate in collecting the State's taxes. The State in fact seized shipments traveling to the reservations from out-of-state wholesalers before being enjoined from doing so by the District Court, and it has declared its intention to continue such seizures if successful in this litigation. The Tribes contest this power, noting that because sales by wholesalers to the tribal businesses are concededly exempt from state taxation, no state tax is due while the cigarettes are in transit.

We find that Washington's interest in enforcing its valid taxes is sufficient to justify these seizures. Although the cigarettes in transit are as yet exempt from state taxation, they are not immune from seizure when the Tribes, as here, have refused to fulfill collection and remittance obligations which

the State has validly imposed. It is significant that these seizures take place outside the reservation, in locations where state power over Indian affairs is considerably more expansive than it is within reservation boundaries. Cf. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973). By seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests.

Washington further contends that it may enter onto the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell these stocks in order to obtain payment of the taxes due. However, this question, which obviously is considerably different from the preceding one, is not properly before us. The record does not disclose that the State has ever entered the reservations to seize cigarettes because of the Tribes' failure to collect the taxes due on sales to nonmembers, or ever threatened to do so except in papers filed in this litigation. Indeed, the State itself concedes that "it may very well be that this Court will find it unnecessary to rule on this aspect of the appeal." Brief for Appellants in No. 78–630, p. 110. We therefore express no opinion on the matter.

## V

The next issue concerns the challenge in the *Colville* case to the Washington motor vehicle and mobile home, camper and travel trailer taxes. Although not identical, these taxes are quite similar. Each is denominated an excise tax for the "privilege" of using the covered vehicle in the State, each is assessed annually at a certain percentage of fair market value, and each is sought to be imposed upon vehicles owned by the Tribe or its members and used both on and off the reservation.[29]

---

[29] In the wake of *McClanahan* v. *Arizona State Tax Comm'n* and *Moe,* the State does not claim that it can impose these taxes upon vehicles used wholly within the reservation. Brief for Appellants in No. 78–630, p. 111, and n. 77.

Once again, our departure point is *Moe*. There we held that Montana's personal property tax could not validly be applied to motor vehicles owned by tribal members who resided on the reservation. 425 U. S., at 480–481. The vehicles Montana attempted to tax were apparently used both on and off the reservation,[30] and the tax was assessed annually at a percentage of market value of the vehicles in question. Thus, the only difference between the taxes now before us and the one struck down in *Moe* is that these are called excise taxes and imposed for the privilege of using the vehicle in the State, while the Montana tax was labeled a personal property tax. The State asserts that this difference mandates a different result. In *Moe*, it argues, the District Court concluded that the taxable event was "the ownership of a motor vehicle as of January 1 of each year,"[31] and that event took place on the reservation. Accordingly, under *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973), Montana was without authority to impose its tax. In the present case, the State continues, the taxable event is the use *within the State* of the vehicle in question. Thus, we are told, the *McClanahan* principle is inapplicable and the tax should be upheld under *Mescalero Apache Tribe* v. *Jones, supra*.

We do not think *Moe* and *McClanahan* can be this easily circumvented. While Washington may well be free to levy a tax on the use outside the reservation of Indian-owned vehicles, it may not under that rubric accomplish what *Moe* held was prohibited. Had Washington tailored its tax to the amount of actual off-reservation use, or otherwise varied some-

---

[30] *Moe* did not focus upon vehicle use at all. The District Court opinion in that case, however, indicates that some of the vehicles to which Montana sought to apply its tax were used both on and off the reservation. *Confederated Salish and Kootenai Tribes* v. *Montana*, 392 F. Supp. 1325, 1328–1329 (Mont. 1975) (three-judge court) (Smith, J., concurring in part and dissenting in part).

[31] *Id.*, at 1327, citing the Montana statute, Mont. Rev. Codes Ann. § 84–406 (2) (Supp. 1974).

thing more than mere nomenclature, this might be a different case. But it has not done so, and we decline to treat the case as if it had.

## VI

Finally, we come to the challenge by the Colville, Lummi, and Makah Tribes to the State's assumption of civil and criminal jurisdiction over them. The District Court found that assumption unlawful as regards the Makah and Lummi Reservations and lawful as regards the Colville Reservation. 446 F. Supp., at 1366–1367. The State challenges the former findings.

All parties apparently recognize that this issue is controlled by the intervening decision in the State's favor in *Washington v. Yakima Indian Nation,* 439 U. S. 463 (1979). There a pattern of jurisdiction identical to those created on the Makah and Lummi Reservations was upheld, and the holding of the Court of Appeals for the Ninth Circuit on which the District Court in the present case relied for its conclusion that such patterns are unconstitutional was reversed. We therefore uphold the State's assumption of jurisdiction over the Makah and Lummi Reservations.[32] Accordingly, the judgments of the District Court are

*Reversed in part and affirmed in part.*

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, concurring in part and dissenting in part.

I agree with the Court's analysis of the jurisdictional questions posed in these cases, as well as with its treatment of the

---

[32] In No. 78–60, *Confederated Tribes of the Colville Indian Reservation et al.* v. *Washington et al.,* which is pending on appeal, the Colville Tribe appeals from so much of the District Court's judgment as reflects the holding that Washington's assumption of total jurisdiction over that Tribe's reservation was lawful. See 446 F. Supp., at 1366–1367. The Colville Tribe challenges that holding on grounds (1) that Washington could not assume jurisdiction without amending its Constitution and (2) that the assumption of total jurisdiction over only selected reservations violates the

Washington motor vehicle, mobile home, camper and travel trailer taxes and its disposition of the assumption-of-jurisdiction issue. Accordingly, I join in their entirety Parts I, II, III, V, and VI of the Court's opinion. I also agree with Part IV insofar as it holds that the Colville, Makah, and Lummi Tribes have the power to impose their cigarette taxes on nontribal purchasers (Part IV–B (1)). As the Court points out, the power to tax on-reservation transactions that involve a tribe or its members is a "fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication . . . ." *Ante,* at 152. Recognition of that fundamental attribute, however, leads me to disagree with much of the balance of the Court's Part IV. In my view, the State of Washington's cigarette taxing scheme should be invalidated both because it undermines the Tribes' sovereign authority to regulate and tax the distribution of cigarettes on trust lands and because it conflicts with tribal activities and functions that have been expressly approved by the Federal Government.

# I

I begin with a somewhat general overview. While they are sovereign for some purposes, it is now clear that Indian reservations do not partake of the full territorial sovereignty of States or foreign countries.[1] The result has been to blur the

---

Equal Protection Clause. *Washington* v. *Yakima Indian Nation,* 439 U. S. 463 (1979), disposes of the first contention, *id.,* at 493, and makes clear that the second must fail if the assumption of jurisdiction is rationally related to some valid state purpose, *id.,* at 500–502. We find the pattern of jurisdiction in the present case rational: The Colville Tribe consented in 1965 to the State's assumption of jurisdiction over it, and the State has assumed total jurisdiction only over tribes that have so consented. The presence or absence of tribal consent is a rational basis for distinguishing among reservations, and there is thus no constitutional infirmity. Accordingly, the judgment is in this respect affirmed.

[1] The starkest territorial conception of Indian sovereignty was sketched by Mr. Chief Justice Marshall in *Worcester* v. *Georgia,* 6 Pet. 515,

boundary between state and tribal authority. A few guide-posts do exist, however. First, in the absence of tribal con-"sent state law does not reach on-reservation conduct involving only Indians. Thus we have held that tribal courts have exclusive jurisdiction over adoption proceedings involving the on-reservation conduct of tribal members, *Fisher* v. *District Court*, 424 U. S. 382 (1976); that States cannot apply their income taxes to the receipts derived by reservation Indians from reservation sources, *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973); and that States may not levy cigarette taxes on on-reservation sales to reservation Indians or impose personal property taxes on property owned by such Indians, *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463, 480–481 (1976).

Second, there is a significant territorial component to tribal power. Thus state taxes on the off-reservation activities of Indians are permissible, *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145 (1973), and tribal laws will often govern the on-reservation conduct of non-Indians. *Williams* v. *Lee*, 358

557–561 (1832). An Indian reservation, he stated, was "a distinct community, occupying its own territory . . . in which the laws of Georgia can have no force . . . ." See F. Cohen, Handbook of Federal Indian Law 122 (1942). *Williams* v. *Lee*, 358 U. S. 217, 219 (1959), noted that this view had been "modified . . . in cases where essential tribal relations were not involved." *Kake Village* v. *Egan*, 369 U. S. 60, 71–75 (1962), noted a shift as well. And *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 172 (1973), observed that "the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction." Rather, *McClanahan* concluded, sovereignty is better seen as a "backdrop against which the applicable treaties and federal statutes must be read." *Ibid.* In a similar vein, *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, 208 (1978), recognized that Indian tribes are "prohibited from exercising both those powers of autonomous States that are expressly terminated by Congress and those powers 'inconsistent with their status.'" (Emphasis and citations omitted.) Still, *United States* v. *Wheeler*, 435 U. S. 313, 322–326 (1978), emphasized the sovereign nature of tribal authority over Indians. See also *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148 (1973); *Antoine* v. *Washington*, 420 U. S. 194, 201–203 (1975).

U. S. 217 (1959). See also *United States* v. *Mazurie,* 419 U. S. 544, 557–558 (1975).[2]

Third, where it is necessary to resolve a conflict between state and tribal authority over on-reservation conduct involving Indians and non-Indians, a relatively particularistic look at the interests of State and tribe and the federal policies that govern relations with Indian tribes is appropriate. We have concluded, for example, that a tribe lacks jurisdiction to try a non-Indian for a crime, *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191, 208 (1978), but that a State may not resolve a dispute arising out of on-reservation transactions between an Indian purchaser and a non-Indian seller, *Williams* v. *Lee, supra,* at 219, or tax the gross receipts of a federally licensed retail trading post that deals on the reservation with reservation Indians, *Warren Trading Post Co.* v. *Arizona State Tax Comm'n,* 380 U. S. 685 (1965).

And fourth, the preceding results flow from an intricate web of sources including federal treaties and statutes, the broad policies that underlie those federal enactments, and a presumption of sovereignty or autonomy that has roots deep in aboriginal independence. The prevalent mode of analysis is one of pre-emption. It takes as its starting point the exclusive power of the Federal Government to regulate Indian tribes and proceeds to bound state power where necessary to give vitality to the federal concerns at stake. *Bryan* v.

---

[2] This territorial component is also suggested by recent statutes like the Clean Air Act Amendments of 1977, 91 Stat. 685, 735, which provide that "[l]ands within the exterior boundaries of reservations of federally recognized Indian tribes" may be redesignated for air quality purposes "only by the appropriate Indian governing body." A similar note is sounded in the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 445, 523. In addition, a geographical or territorial source for Indian authority may be found in the Washington Enabling Act, 25 Stat. 676, § 4, by which the State was required to disclaim "all right and title" to lands "owned or held by any Indian or Indian tribes" and to agree that such lands "shall remain under the absolute jurisdiction and control of the Congress. . . ."

*Itasca County,* 426 U. S. 373, 376, n. 2 (1976). Only rarely does the talismanic invocation of constitutional language or rigid conceptions of state and tribal sovereignty shed light on difficult problems. *Moe, supra,* at 481, n. 17; *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 172.

For present purposes, two federal concerns seem especially important. One is the strong and oft-cited policy of encouraging tribal self-government. *United States* v. *Wheeler,* 435 U. S. 313, 322–326 (1978); *Fisher* v. *District Court, supra,* at 386–388; *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 179; *Williams* v. *Lee, supra,* at 219–220. And the other is a complementary interest in stimulating Indian economic and commercial development. Both found expression ·in the Indian Reorganization Act of 1934, 25 U. S. C. § 461 *et seq.,*[3] and are manifest in more recent statutes as well.[4] They are,

_____

[3] See *Mescalero Apache Tribe* v. *Jones,* 411 U. S., at 151–152. There we noted that the "intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.' " *Id.,* at 152, quoting H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934). · The Reorganization Act itself contains a number of provisions that demonstrate Congress' concern with encouraging Indian economic development. See 25 U. S. C. §§ 469, 470, and 477. See also *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 59–60 (1978).

[4] See the Indian Self-Determination and Education Assistance Act of 1975, 25 U. S. C. § 450 *et seq.,* and the Indian Financing Act of 1974, 25 U. S. C. § 1451 *et seq.* Section 2 of the latter statute states as follows:

"It is hereby declared to be the policy of Congress to provide capital . . . to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities." 88 Stat. 77.

Adherence to the policies underlying the Reorganization Act has not been without some interruption. The Termination Acts of the 1950's, see, *e. g.,* 25 U. S. C. §§ 564, 721–728, 741–760, and 891–901 (1958 ed.) seem to have signalled a congressional urge to pursue an assimilationist policy somewhat

I believe, of central importance in analyzing any conflict of state and tribal law.

## II

With this as background, I turn to the particular problem at hand. Like the Court, I begin with *Moe, supra,* which considered a state cigarette tax similar to the one at issue here. There we started with the observation that the tax itself was "concededly lawful"—it neither fell upon tribal members nor impinged on tribal functions. 425 U. S., at 483. The key problem, as we saw it, was one of enforcement: Could the State of Montana require the Indian seller to collect a tax validly imposed on the non-Indian purchaser? We determined that the burden of collection was minimal and noted that it would in no sense "frustrat[e] tribal self-government." [5] Accordingly, we held that it could be imposed to prevent wholesale tax avoidance by non-Indian purchasers.

As the Court points out, *Moe* does suggest a number of limits upon Indian sovereignty in general and the federal interests in tribal self-government and economic growth in particular: It permits state law to come on the reservation in the form of a tax and collection requirement, and it upholds the imposition of a tax that will undoubtedly hurt Indian retailing activities by depriving tribal smokeshops of a competitive edge.

But while in *Moe* the cigarette business was largely a private operation, the Tribes involved in these cases have adopted comprehensive ordinances regulating and taxing the distribution of cigarettes by on-reservation shops. Phrased differently, these Tribes are acting in federally sanctioned and

---

akin to the approach that was dominant prior to the Reorganization Act. See generally *Menominee Tribe* v. *United States,* 391 U. S. 404 (1968). But present policy "appears to be returning to a focus upon strengthening tribal self-government." *Bryan* v. *Itasca County,* 426 U. S. 373, 389, n. 14 (1976).

[5] *Moe,* 425 U. S., at 483, citing *Williams* v. *Lee,* 358 U. S., at 219–220.

encouraged ways—they are raising governmental revenues, establishing commercial enterprises, and struggling to escape from " 'a century of oppression and paternalism.' " *Mescalero Apache Tribe* v. *Jones,* 411 U. S., at 152, quoting H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934). As I see it, that difference has three important consequences. First, it means that in this case the sharp drop in cigarette sales that would result from imposition of the state tax will reduce revenues not only of individual Indian retailers, but also of the Tribes themselves as governmental units. Second, it means that a decision permitting application of the state tax would place Indian goods at an actual competitive *disadvantage* as compared to non-Indian ones because the former would have to bear two tax burdens while the latter bore but one. And third, it leads to an actual conflict of jurisdiction and sovereignty because imposition of the Washington tax would inject state law into an on-reservation transaction which the Indians have chosen to subject to their own laws.

The Court in effect concludes that these consequences are insignificant. The first, it suggests, is undercut by *Moe,* which made clear that Indian retailers have no absolute right to market their tax-exempt status. The second is too speculative—"the Tribes have failed to demonstrate that business at the smokeshops would be significantly reduced by a state tax without a credit as compared to a state tax with a credit." *Ante,* at 157. And the third "need not detain us" because "[t]here is no direct conflict between the state and tribal schemes. . . ." *Ante,* at 158.

I do not agree. Whatever their individual force, I think that in combination these three consequences bring the Washington taxes into sharp conflict with important federal policies. Perhaps most striking is the fact that a rule permitting imposition of the state taxes would have the curious effect of making the federal concerns with tribal self-government and commercial development inconsistent with one another. In essence, tribes are put to an unsatisfactory choice. They are

free to tax sales to non-Indians, but doing so will place a burden upon such sales which may well make it profitable for non-Indian buyers who are located on the reservation to journey to surrounding communities to purchase cigarettes.[6] Or they can decide to remain competitive by not taxing such sales, and in the process forgo revenues urgently needed to fill governmental coffers. Commercial growth, in short, can be had only at the expense of tax dollars. And having to make that choice seriously intrudes on the Indians' right "to make their own laws and be ruled by them," *Williams* v. *Lee,* 358 U. S., at 219–220.[7]

------

[6] This problem was entirely absent in *Moe.* Nothing in the result there disfavored the purchase of Indian goods. Rather, imposition of the state tax on non-Indians simply created a situation in which persons were encouraged to buy cigarettes on the basis of factors other than tax benefits and avoidance—factors like geographical location and convenience. In the present situation, the state tax actually tips the balance against the Indians.

[7] It might be argued that the choice I describe is entirely common-place—that in making its taxing decisions every governmental unit is required to balance its revenue needs against the economic impact of the taxes it considers. In one sense, this is quite true: If one State has a very low sales tax, a neighboring State's ability to impose a higher one may as a practical matter be impaired. In some circumstances, it can cope with this situation by imposing a complementary tax on the in-state use of goods purchased elsewhere. *National Geographic Society* v. *California Bd. of Equalization,* 430 U. S. 551, 555 (1977). And in others there will exist no efficacious way of collecting such a tax. Whatever the case, however, the two States will face each other across their common border with equal arsenals.

I think the present situation is readily distinguishable for the simple reason that Indian reservations are not States. This has two sorts of consequences. First, it means the equality noted in the preceding paragraph is absent. *Moe* holds that sellers on an Indian reservation may be required to collect state taxes on sales to non-Indians that occur entirely on the reservation. Yet it is highly unlikely that the Tribes in these cases could require sellers elsewhere in Washington to collect tribal taxes. And second, Indian Tribes, while less autonomous than States in important respects, are the special beneficiaries of certain federal concerns and policies. As a result,

The Court provides no satisfactory explanation of why the State is free to put the Tribes to such a choice. Rather, it characterizes the tribal business as an effort to market a tax exemption and proceeds to label that effort illegitimate and beyond the reasonable bounds of any federally protected tribal right. Yet that line of argument could at most justify a state tax which through some sort of credit mechanism ensures that the location of cigarette purchases is independent of state and tribal taxing schemes—it does not support a rule that the State may tax all on-reservation sales to non-Indians regardless of tribal taxes.[8] Nor is the Court's argument saved by the contention that the Tribes have failed to prove that the combination of these particular tribal and state taxes will cause Indian smokeshops to lose volume that would otherwise be theirs. The fact is that the Court today permits the State to enact a tax without risking any attendant loss of business for its retailers while the Tribes must court economic harms when they enact taxes of their own. That result erodes the Tribes' sovereign authority and stands the special federal solicitude for Indian commerce and governmental autonomy on its head.

The conflict with federal law is particularly evident on the present facts because the Secretary of the Interior—acting pursuant to lawful regulations—has approved the tribal taxing and regulatory schemes at issue here. That approval, and the federal policies which underlie it, both enhances tribal authority and ousts inconsistent state law. Cf. *Fisher* v.

---

the tradeoffs and frictions that may be inevitable in the state-state context demand special scrutiny in the state-reservation context. Tribes may lack the tools needed to protect themselves, and protecting them is an important federal concern. Cf. *Morton* v. *Mancari*, 417 U. S. 535, 551–555 (1974).

[8] See *Mescalero Apache Tribe* v. *Jones*, 411 U. S., at 152 (quoting legislative history to the effect that Indians should be able to "enter the white world on a footing of equal competition").

*District Court,* 424 U. S. 382 (1976) ; *United States* v. *Mazurie,* 419 U. S. 544 (1975).

The Court draws support for its result from the suggestion that a decision invalidating these taxes would give the Tribes *carte blanche* to establish vast tax-exempt shopping centers dealing in every imaginable good. I think these fears are substantially overdrawn. *Moe* made clear that Indians do not have an absolute entitlement to achieve some particular sales volume by passing their tax-exempt status to non-Indian customers, and I do not question that conclusion today. I would simply hold that the State may not impose a tax that forces the Tribes to choose between federally sanctioned goals and places their goods at an actual competitive disadvantage. Nothing in such a holding would emasculate state taxing authority or bring the specter of enormous tribal tax havens closer to reality. On the contrary, I am confident that the State could devise a taxing scheme without the flaws which mar the present one.

In sum, I would hold these taxes impermissible and save for another day the question of what sorts of less intrusive measures a State may take to protect its tax base and avoid the parade of horribles alluded to by the Court.

### III

Because I would hold the state cigarette taxes invalid, I would not reach the bulk of the recordkeeping and enforcement issues addressed by the Court in Parts IV–C and IV–E of its opinion. Indeed, since the District Court failed to discuss most of those issues, I am startled that the majority proceeds to address and decide them rather than remanding for the views of that court. In my judgment, only one relatively narrow recordkeeping issue ought be addressed at this time, and that concerns the District Court's holding that the State could not require the Tribes to keep records of exempt sales to facilitate collection of valid taxes on nonexempt sales. 446 F. Supp. 1339, 1358–1359, 1373. The District Court

found the record in this case inadequate to show any need for such documentation. The Court, however, sees this as no obstacle to upholding the requirement. I disagree. The State has no direct power over exempt sales, and I see no reason why it should be permitted to require Indians to keep records of such sales absent some showing of necessity or utility. In consequence, I would either affirm the District Court in this regard or remand so that the record may be supplemented.

For the foregoing reason, I dissent as to Parts IV–B (2), IV–C, and IV–E.

MR. JUSTICE STEWART, concurring in part and dissenting in part.

I join all but Part IV–B (2) and Part V of the Court's opinion. My disagreement with Part V is for the reasons stated in Part III of MR. JUSTICE REHNQUIST'S separate opinion. My disagreement with Part IV–B (2) stems from the belief that the State of Washington cannot impose the full combined measure of its cigarette and sales taxes on purchases by nontribal members of cigarettes from tobacco outlets on the Colville, Lummi, and Makah Reservations.

In *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 481–483, the Court held that a State has the power to tax sales of cigarettes to non-Indians by Indian tobacco outlets, despite the exemptions from state taxes possessed by an Indian tribe and its members themselves. The State may exert this power, according to *Moe,* even if it thereby deprives the tribe or the enterprises the tribe operates of substantial revenues. Cf., *Thomas* v. *Gay,* 169 U. S. 264. The cigarette and sales tax aspects of this case would, therefore, be wholly controlled by the *Moe* decision, but for the fact that all of the appellee Tribes levy their own cigarette excise taxes on the on-reservation distribution of cigarettes to non-Indians.

It seems clear to me that the appellee Tribes enjoy a power at least equal to that of the State to tax the on-reserva-

tion sales of cigarettes to nontribal members. Those sales are entered into and consummated in places and circumstances subject to the Tribes' protection and control. Furthermore, the taxation of such transactions effectuates recognized federal policies by providing funds for the maintenance and operation of tribal self-government. See generally Indian Reorganization Act of 1934, 25 U. S. C. § 461 *et seq; McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 179–181; *Williams* v. *Lee,* 358 U. S. 217.

Consequently, when a State and an Indian tribe tax in a functionally identical manner the same on-reservation sales to nontribal members, it is my view that congressional policy conjoined with the Indian Commerce Clause requires the State to credit against its own tax the amount of the tribe's tax. This solution fully effectuates the State's goal of assuring that its citizens who are not tribal members do not cash in on the exemption from state taxation that the tribe and its members enjoy. On the other hand, it permits the tribe to share with the State in the tax revenues from cigarette sales, without at the same time placing the tribe's federally encouraged enterprises at a competitive disadvantage compared to similarly situated off-reservation businesses.

Turning to the case at hand, the approach I have outlined leads me to one conclusion with respect to sales on the Colville, Lummi, and Makah Reservations, and another with respect to sales on the Yakima Reservation. The Colville, Lummi, and Makah Tribes each collect from the operators of on-reservation tobacco outlets a tax of 40 to 50 cents per carton. Although in each case the tax is imposed at the time the cigarettes are distributed by the Tribe to the retail outlets, the pertinent taxing ordinance requires that the tax be passed on to the ultimate consumer. Thus, the actual event taxed, as with the State's cigarette excise tax and general sales tax, is the sale to the nontribal purchaser. Since the Tribe's cigarette tax operates in functionally the same way as do the State's cigarette excise and general sales taxes, I would hold that the

State must credit the tribal tax against the combination of its cigarette excise tax and general sales tax.

The tax imposed by the Yakima Tribe operates differently. The Tribe purchases cigarettes from out-of-state dealers and sells them to its licensed retailers. In connection with this transaction, the Tribe receives from its licensed retailers a tax of 22.5 cents per cigarette carton. Unlike the situation with the Colville, Lummi, and Makah taxes, however, there is no requirement that the tax then be added to the ultimate retail selling price. As a consequence, the event taxed is not the sale to the ultimate cigarette purchaser, and for this reason I believe that the State has no obligation to credit the Indian tax against the combination of its cigarette excise and general sales taxes.

Accordingly, I would vacate the judgment of the District Court insofar as it invalidates *in toto* the imposition of the State's cigarette excise and general sales taxes upon cigarette sales on the Colville, Lummi, and Makah Reservations, and remand the case for further proceedings. I would reverse the judgment of the District Court insofar as it bars the imposition of the State's taxes upon sales of cigarettes on the Yakima Reservation.

MR. JUSTICE REHNQUIST, concurring in part, concurring in the result in part, and dissenting in part.

Since early in the last century, this Court has been struggling to develop a coherent doctrine by which to measure with some predictability the scope of Indian immunity from state taxation.[1] In recent years, it appeared such a doctrine was well on its way to being established. I write separately to underscore what I think the contours of that doctrine are because I am convinced that a well-defined body of principles is essential in order to end the need for case-by-case litigation which has plagued this area of the law for a number of years.

---

[1] Much of that developmental history is recounted in *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 168–172 (1973).

That doctrine, I had thought, was at bottom a pre-emption analysis based on the principle that Indian immunities are dependent upon congressional intent, *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973); *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145 (1973); *Moe* v. *Salish & Kootenai Tribes*, 425 U. S 463 (1976); *Bryan* v. *Itasca County*, 426 U. S. 373 (1976), at least absent discriminatory state action prohibited by the Indian Commerce Clause. I see no need for this Court to balance the state and tribal interests in enacting particular forms of taxation in order to determine their validity. *Ante,* at 156–157. Absent discrimination, the question is only one of congressional intent. Either Congress intended to pre-empt the state taxing authority or it did not. Balancing of interests is not the appropriate gauge for determining validity since it is that very balancing which we have reserved to Congress. I concur in the Court's conclusion, however, that the cigarette tax is valid because Congress has not pre-empted state authority to impose the tax.

I

The principles necessary for the resolution of this case are readily derived from our opinions in *McClanahan* and *Mescalero*. *McClanahan* confirmed the trend which had been developing in recent decades towards a reliance on a federal pre-emption analysis. Congress has for many years legislated extensively in the field of Indian affairs. *McClanahan* therefore recognized that the answer to most claims of Indian immunity from state power could be resolved by looking "to the applicable treaties and statutes which define the limits of state power." 411 U. S., at 172.[2]

---

[2] The Court in *McClanahan* did not resolve to what extent residual Indian sovereignty in the total absence of federal treaty obligations or legislation still would be recognized. The Court found that "[t]he question is generally of little more than theoretical importance, . . . since in almost all cases federal treaties and statutes define the boundaries of federal and

Despite the expanse of congressional statutes regulating Indian affairs over the years, *McClanahan* foresaw that congressional intent would not always be readily apparent. As a guide to ascertaining that intent in such cases, the Court invoked the tradition of Indian sovereignty as reflected by the earlier decisions of this Court: "The Indian sovereignty doctrine is relevant, . . . not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read." *Ibid.*

*McClanahan* readily illustrates application of the analysis. The question presented in that case was whether the State of Arizona had jurisdiction to impose a tax on a reservation Indian's income derived solely from reservation sources. The Court first reviewed the "tradition of sovereignty" relevant to this "narrow question." *Id.*, at 168.[3] Historically this Court had found Indians to be exempt from taxes on Indian ownership and activity confined to the reservation and not involving non-Indians.[4] *The Kansas Indians,* 5 Wall. 737 (1867). With this tradition placing reservation-ownership beyond the jurisdiction of the States, the Court undertook a review of the relevant treaties and statutes to determine

---

state jurisdiction." 411 U. S., at 172, n. 8. I am convinced that this "residue" of sovereignty is no greater than the freedom from nondiscriminatory taxation held sufficient to protect sovereignty in other areas of constitutionally derived immunities. See n. 9, *infra.* Our opinions have recognized that Indian sovereignty is dependent upon congressional preservation, see *United States* v. *Wheeler,* 435 U. S. 313, 323 (1978), and I decline to use our adjudicatory powers to assume a role properly reserved to Congress.

[3] The Court emphasized that its review of Indian sovereignty was relevant only to this narrow category, *i. e.,* the reservation-derived income of a reservation Indian, and that the Court was expressly not reviewing any situation in which the State attempted to exert its sovereignty over non-Indians undertaking activity on Indian reservations. 411 U. S., at 168.

[4] I use "Indians" throughout this discussion of sovereign immunity to refer to members of a reservation tribe. See *infra,* at 186–187.

whether this tradition of immunity had been altered by Congress.[5] Although no legislation directly provided that Indians were to be immune from state taxation under these circumstances, the enactments reviewed were certainly suggestive of that interpretation. See Arizona Enabling Act, § 20, 36 Stat. 569; the Buck Act, 4 U. S. C. § 105. The Court therefore declined to infer a congressional departure from the prior tradition of Indian immunity absent an express provision otherwise. Thus, as this Court's opinion in *Bryan* v. *Itasca County, supra,* later characterized it, *McClanahan* established a rule against finding that "ambiguous statutes abolish by implication Indian tax immunities." 426 U. S., at 392.

The companion case to *McClanahan, Mescalero Apache Tribe* v. *Jones, supra,* established the corollary principle: When tradition did not recognize a sovereign immunity in favor of the Indians, this Court would recognize one only if Congress *expressly* conferred one. In *Mescalero,* the State of New Mexico asserted the right to impose a tax on the gross receipts of a ski resort owned and operated by an Indian tribe. The resort was located on federal land adjacent to the Indian reservation, was developed under the auspices of the Indian Reorganization Act of 1934, 25 U. S. C. § 461 *et seq.,* and was funded with federal money.

The Court in *Mescalero* applied precisely the analysis *McClanahan* adopted. First, the Court reviewed the tradition of sovereignty and found that no immunity for off-reservation activities had traditionally been recognized. See *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575 (1928); *Ward* v. *Race Horse,* 163 U. S. 504 (1896). With that tradition as its backdrop, the Court reviewed the particular statutes relevant to the question of whether or not Congress intended

---

[5] The Court has explicitly held that attributes of Indian sovereignty are subject to complete defeasance by Congress. *United States* v. *Wheeler, supra,* at 323.

to immunize the Indian enterprise from the state gross receipts tax. The principal Act relevant to the inquiry was the Indian Reorganization Act, since it was the Act under which the tribal enterprise was being conducted. Section 5 of that Act, 25 U. S. C. § 465, provides that the lands acquired under authority of the Act are exempt from state and local taxation. The Court nevertheless refused to read § 5 as broadly conferring an immunity from income as well as property taxes. The Court invoked the well-established rule that " 'tax exemptions are not granted by implication,' " that such exemptions may not rest on " 'dubious inferences,' " but that they must be provided in " 'plain words.' " 411 U. S., at 156, quoting *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598, 606–607 (1943). Despite the clear federal purpose of promoting this tribal economic enterprise, the Court found that no judicial immunities could appropriately be implied.[6]

The subsequent Indian tax immunity cases have been unanimously resolved through application of the corollary principles of construction established in *McClanahan* and *Mescalero.* In *Moe* v. *Salish & Kootenai Tribes,* the Court invalidated attempted state taxation of Indian conduct and property confined to the reservation. The Court found, however, that imposition of a state tax on its non-Indian residents' purchases of cigarettes from Indian sellers on a reservation could not be found to "ru[n] afoul of any congressional enactment dealing with the affairs of reservation Indians." 425 U. S., at 483. In *Bryan* v. *Itasca County, supra,* the question was whether the congressional grant of civil jurisdiction to the States conferred by 28 U. S. C. § 1360 was a general grant of power to tax reservation Indians. The tradition, of course, was otherwise and the statute did not specifically state that

---

[6] In addition, the Court expressed the opinion that congressional policy was not at odds with state taxation since Congress intended that the Indians be prepared to "enter the white world on a footing of equal competition." 411 U. S., at 157.

a repeal of those immunities was intended. Consistent with the principles enunciated in *McClanahan,* the Court reasoned that

> "[t]his omission has significance in the application of the canons of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress." 426 U. S., at 381.

Adherence to these principles of construction maximizes the ability of States and tribes to determine the scope of their respective authority without resort to adjudication, and maximizes judicial deference to the legislative forum.

## II

Application of these principles readily resolves the validity of the cigarette tax levied by the State. The tax represents a permissible nondiscriminatory exercise of state sovereign authority which has not been pre-empted by Congress. These principles also dispose of the claim of nontribal Indians to an immunity.

## A

At issue here is not only Indian sovereignty, but necessarily state sovereignty as well. As a general rule, of course, States are given wide latitude in the exercise of their sovereign powers to tax. In *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 293 (1976), this Court cautioned against invalidating any state taxation absent "the clearest . . . mandate." Here the State attempts to tax its citizens' use of cigarettes purchased in a territory subject to the control of another sovereign.[7] As a general matter, we have repeatedly held that such an exercise of state taxing power is permissible. Here there is no ques-

---

[7] Indian reservations are not of course subject to the exclusive control of the tribe. The Federal Government and the States also have jurisdiction for some purposes.

tion that the State, by taxing its own non-Indian residents, has "exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred," and "[t]he fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444–445 (1940). Use tax schemes applicable to purchases in other States, precisely comparable to that in issue here, have long been upheld as a permissible exercise of state taxing power. *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 (1937); *National Geographic Society* v. *California Board of Equalization*, 430 U. S. 551 (1977). Of course in order to collect the tax from the merchant located beyond the territorial jurisdiction of the taxing State, there must also be a relationship between the State and the burdened merchant sufficient to satisfy principles of due process. *National Geographic Society, supra.* After *Moe,* however, the retailers on the tribal reservation cannot gain invalidation of the tax on this basis. 425 U. S., at 482–483. Thus the State has exercised its taxing authority consistent with its sovereign powers and constitutional due process.

An otherwise legitimate exercise of state taxing authority will be illegitimate, of course, if it is sought to be applied in contravention of a constitutional or federal statutory immunity. Indian sovereign immunity from nondiscriminatory taxation is a question of congressional pre-emption. As outlined, we must first identify the backdrop of sovereignty in order to interpret congressional intent in the field. As *McClanahan* implicitly recognized through its citation of authorities, the traditional cases clearly did not find that Indian sovereign immunity was contravened by subjecting tribes to the burdens inherent in state taxation of the reservation activities of non-Indians. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647 (1930); *Utah & Northern R. Co.* v. *Fisher,* 116 U. S. 28 (1885); *Thomas* v. *Gay,* 169 U. S. 264 (1898).

*Thomas* v. *Gay* perhaps best illustrates the "backdrop" relevant to the State's cigarette tax in issue. In *Thomas,* the State attempted to tax the cattle grazing on reservation lands leased, pursuant to congressional authorization, by Indians to non-Indians. The Court found that the Indians' sovereign immunity did not operate to curtail state authority to impose this tax. The case is particularly significant because of the arguments which it expressly rejects. The tribe complained that the tax had to be invalidated because the revenues which it received as lessor would be directly reduced as a result of the state tax since lessees would be unwilling to pay the same price for tax-exempt grazing lands as for taxable grazing lands. The Court stated that it is urged that

> "the money contracted to be paid for the privilege of grazing is paid to the Indians as a tribe, and is used and expended by them for their own purposes, and that if, by reason of this taxation, the conditions existing at the time the leases were executed were changed, or could be changed by the legislature of Oklahoma at its pleasure, the value of the lands for such purposes would fluctuate or be destroyed altogether according to such conditions." *Id.,* at 273.

*Thomas* v. *Gay* is a part of the "backdrop" which supports Washington's power to impose the tax in issue.[8] The ap-

---

[8] It should be noted that the principles in *Thomas* v. *Gay* were not always those used to determine Indian immunities. A series of decisions, as noted in *McClanahan,* treated Indian immunities as derivative from the Federal Government's immunity from state taxation. During the reign of the treatment of Indian reservations as federal instrumentalities for purposes of state taxation, this Court did prohibit States from taxing the net income derived by the lessees of Indian lands. *Gillespie* v. *Oklahoma,* 257 U. S. 501 (1922). See also *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292 (1914); *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. 522 (1916). While *Thomas* v. *Gay* was never explicitly overruled, these decisions were clearly inconsistent. Nevertheless, it was the line of

pellee Tribes maintain that the tax in issue is impermissible, though permissible in *Moe,* because here the Tribes are raising governmental revenues and establishing commercial enterprises. The effect of the state tax then would be to reduce the tribe's governmental revenues and force the tribe to choose between losing those revenues by forgoing its tax or subjecting reservation retailers to a competitive disadvantage compared to those retailers outside the reservation not subject to the tribal tax. These may be the facts, but they are facts which *Thomas* v. *Gay* held to be irrelevant to the recognition of a sovereign tribal immunity. In *Thomas,* the tribe's involvement was far more direct than that in issue here since it was a tribal leasing enterprise. There, the State's exercise of jurisdiction clearly required the tribe, as lessor, to forgo some portion of rent which could have been charged, and used the same as tax revenues, had the State not asserted its taxing authority. The tribe could recover the full rent (part of which may readily be considered the equivalent of a tax and another part perhaps proprietary profit) only at the risk of discouraging the economic enterprise. It is apparent therefore that the backdrop relevant to this action is one of no sovereign immunity.[9]

---

analysis employed in *Gillespie* that was later overruled in *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376 (1938). *Thomas* v. *Gay* stands as the traditional analysis of Indian sovereign immunity held to be relevant in *McClanahan.*

[9] This conclusion derives support from not only *Thomas* v. *Gay* but also analogous applications of sovereign tax immunities. When two sovereigns have legitimate authority to tax the same transaction, exercise of that authority by one sovereign does not oust the jurisdiction of the other. If it were otherwise, we would not be obligated to pay federal as well as state taxes on our income or gasoline purchases. Economic burdens on the competing sovereign also do not alter the concurrent nature of the taxing authority. Decisions of this Court unequivocally recognize that a state tax comparable to that in issue, imposed on its residents' transactions in another State, or on a federal enclave, will not be barred by force of the respective immunities of that State or the Federal Government. In

Congress could of course countermand this "tradition" of no immunity. But it has not done so. Under Mescalero, it is dispositive of this case that no express immunity has been granted by Congress since the tradition of sovereignty counsels against the immunity. Even going beyond the Mescalero rule against implying an immunity from taxation, I agree with the Court that a review of the statutes does not suggest, even remotely, that Congress intended either by its laws or the policies underlying them to prevent the States from taxing these transactions.[10] In all areas of tax immunity, this Court has staunchly refused to consider the permissibility of a tax by

Henneford v. Silas Mason Co., 300 U. S. 577 (1937), this Court upheld a state tax on one of its resident's use of goods purchased in another State without regard to the fact that the other State's competitive ability to tax the same transaction was obviously reduced. The Court observed that such a tax was permissible even if no credit for the other state tax were allowed. Id., at 581. See also National Geographic Society v. California Board of Equalization, 430 U. S. 551 (1977). Even the sovereign immunity of the Federal Government would not prevent the effects of a tax comparable to those in issue. In United States v. County of Fresno, 429 U. S. 452 (1977), the State sought to impose a possessory use tax on federal employees occupying federal housing located in federal enclaves within the State of California. This Court upheld the tax even though it accepted the Federal Government's argument that in order to remain competitive as an employer or landlord, it would have to reimburse the employees for the payment of the added cost. Id., at 464, and n. 12. See also United States v. Detroit, 355 U. S. 466, 472 (1958); Alabama v. King & Boozer, 314 U. S. 1, 12 (1941). Thus the State, through its exercise of taxing authority, can effectively require the Federal Government to forgo revenues which would otherwise be available to it in order to remain competitive as an enterprise.

[10] The total absence of any suggestion that Congress intended to confer the immunity sought in this action should not be surprising. As this Court has found, other statutes are premised on congressional "recognition of the imperative need of a State to administer its own fiscal operations," free from federal interference. Tully v. Griffin, Inc., 429 U. S. 68, 73 (1976). In Tully, this congressional policy was not found to be diminished even though the State sought to assert its taxing authority over nonresidents.

reference to the economic burdens which it imposes if those burdens are nondiscriminatory and satisfy due process. See *United States* v. *County of Fresno,* 429 U. S. 452 (1977) (state taxation of the Federal Government); *New York* v. *United States,* 326 U. S. 572 (1946) (federal taxation of the state government); *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276 (1976) (state taxation of imports and exports). If Indians are to function as quasi co-sovereigns with the States, they like the States, must adjust to the economic realities of that status as every other sovereign competing for tax revenues, absent express intervention by Congress.[11]

## B

Relying on the same pre-emption analysis, I also concur in the Court's conclusion that Indians not members of the governing tribe are not immune from taxation. *McClanahan/ Mescalero* are once again dispositive. As *McClanahan* explained, the doctrine of sovereign immunity traditionally

---

[11] These considerations, determinative in other areas of tax immunity law, are equally appropriate when one of the taxing jurisdictions is an Indian tribe. While Indian tribes are not States, the tribes are also not helpless hostages of the State absent judicial intervention. Two substantial sources of protection are available to them. First, the Indians could not be subjected to the burdens of discriminatory taxation, *e. g.,* a state tax on only cigarette purchases on a reservation with no corresponding off-reservation tax. The prohibition of discriminatory taxation has been recognized by this Court as a substantial safeguard against the potential for any abusive taxation since only those taxes which the general population are willing to withstand can be imposed. See *County of Fresno, supra,* at 463, n. 11; *Alabama* v. *King & Boozer, supra* (federal immunity); *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977) (state taxation of interstate commerce). Second, Indian tribes are always subject to protection by Congress. This source of protection is more than adequate to preclude any unwarranted interference with tribal self-government. Congress, and not the judiciary, is the forum charged with the responsibility of extending the necessary level of protection beyond that inherent in prohibiting nondiscriminatory taxation.

recognized by this Court derived from the sovereign relationship between a tribe and its members, and a recognition that state jurisdiction should not be asserted in a manner which "frustrates tribal self-government." 411 U. S., at 170. See *Williams* v. *Lee,* 358 U. S. 217, 219–220 (1959); *Moe,* 425 U. S., at 483. Immunities which have formed the backdrop for this Court's pre-emption analysis have been those derived from these precepts. This form of immunity, and the principles which underlie it, are simply inapplicable to the recognition of a tax immunity for an individual who resides on a reservation, but is not a member of the tribe. The holding in *Moe* that non-Indians, even those resident on a reservation, could be subject to cigarette taxes for on-reservation purchases, was a reflection of this principle. The fact that the nonmember resident happens to be an Indian by race provides no basis for distinction. The traditional immunity is not based on race, but accouterments of self-government in which a nonmember does not share.

Congress of course has gone beyond protection of merely Indian self-government, extending its regulatory authority to Indians not residing on the reservation of their own tribe, or, in fact, not residing on any reservation. See 25 U. S. C. § 13 (1970 ed.), as construed in *Morton* v. *Ruiz,* 415 U. S. 199 (1974). See also the definition of "Indian" in the Indian Reorganization Act, 25 U. S. C. § 479. Congress, however, has certainly provided no express immunity from the type of taxation in issue for Indians not members of the tribe, and under the *Mescalero* principles of construction, the backdrop of sovereignty makes it clear that it is not this Court's province to imply such an immunity. These Indians residing on the reservation are citizens of the State, just the same as their non-Indian neighbors, and I am unwilling to conclude that their Indian status entitles them to an implied immunity from taxes which their non-Indian neighbors are required to pay.

## III

I cannot concur in the Court's disposition of the challenge to the state vehicle excise tax. Wash. Rev. Code, chs. 82.44 and 82.50 (1976 and Supp. 1977). The lower court did not conduct a very extensive inquiry into the mechanics or state interpretation of this excise taxing scheme, believing that the tax was clearly invalid under our prior decision in *Moe*. In *Moe,* this Court refused to uphold a State's authority to impose a property tax on motor vehicles owned by tribal members residing on the reservation. The lower court here found that *Moe* was controlling because in both cases the vehicles which the State seeks to tax are used both on and off the reservation, and the tax is assessed annually at a percentage of the market value of the vehicle. Thus the lower court, and this Court, have concluded that the only difference between the taxes is one of label, a difference insufficient to warrant a difference in outcome. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977). The Court therefore looked no further to the operation of the taxing scheme in question.

I do not find the issue clearly disposed of by *Moe* without a dispositive construction of the actual operation of this state taxing scheme. There is of course no question that this Court has discarded the controlling significance of the label a State attaches to its taxes. A tax instead must be judged by its "practical operation." *Detroit* v. *Murray Corp.,* 355 U. S. 489 (1958). But only if the practical operation of this excise taxing scheme is the same as the property taxing scheme addressed in *Moe* would the tax be invalid on the basis of that decision. In *Moe,* the tax was assessed on the basis of ownership, and, therefore, an Indian was required to pay the tax regardless of whether the vehicle was ever used off the reservation. If the state taxing scheme in question here, however, exacts a tax only in the event that the vehicle is used off the reservation, then the practical operation of

the taxes would be totally different. In *Moe,* the Indian purchaser could not avoid assessment of the tax once the vehicle was purchased. It is possible, however, that under an excise taxing scheme no tax would be assessed if the vehicle were used only on the reservation.

What is dispositive for me then is whether Washington has structured or will construe its overall tax and exemption scheme so as to avoid exaction of the tax in the event the vehicle is never used off the reservation. No decision of this Court would preclude the State from taxing Indians for the use of off-reservation highways. The lower court did not appreciate the significance of this distinction and accordingly did not focus on the manner in which the state taxing scheme would be applied to Indians limiting their vehicle use to the reservation. Judge Kilkenny, in a dissenting opinion, found the record inadequate to resolve the question of validity. I agree with Judge Kilkenny that federal courts cannot invalidate state taxes without a thorough review of state law and precedents necessary to determine whether the scheme in fact contravenes federal law. It may well be that the excise tax is applicable without exception to even those Indians using their vehicles exclusively on the reservation, but I would remand the question to the lower court to clarify that this is the controlling question so that it might examine the state taxing scheme under a corrected view of what federal law requires. Cf. *Perkins* v. *Benguet Consolidated Mining Co.,* 342 U. S. 437 (1952); *Zacchini* v. *Scripps-Howard Broadcasting Co.,* 433 U. S. 562, 578–579 (1977).

Assuming a construction which excludes reservation use, *arguendo,* I do not find it significant that Washington has not tailored this tax to the "amount of actual off-reservation use," in which case the Court suggests this tax might be permissible. A non-Indian resident of the State of Washington pays the same tax on his use of the public highways whether he drives his car once a year or every day. We have certainly never held that a State is under an obligation to apportion

its use taxes in such a way that reflects actual use. I am aware of no principle for making a different rule to cover the case of Indians using the public highways. If they choose to avoid the use tax, they need only limit their driving to reservation boundaries. But once they venture onto highways off the reservation, nothing in the United States Constitution, or in the federal statutes, prevents them from being subject to use taxes in common with other state residents.

I would therefore reverse the judgment of the District Court on the issue of the permissibility of the State's assessment of its cigarette tax on purchases made by non-Indians, and by Indians not members of the governing tribe. I would remand the case to that court for a determination of the construction and effect of the state excise tax.