HALL, Circuit Judge
dissenting:
Federal question jurisdiction exists where, inter alia, it is clear from the face of the complaint that “the plaintiffs right to relief necessarily depends on the resolution of a substantial question of federal law.” Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 27-28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). From the record and the pleadings, the tribe is fee simple owner of West-woods and occupies that tract of land outright, invoking at the outset of the case a presumption that Westwoods is Indian land and is thus beyond the regulatory purview of the state. Only by demonstrating (1) that the tribe does not hold aboriginal title to the land and (2) that West-woods in fact is not Indian land within the meaning of 25 U.S.C. § 2703(4) and 18 U.S.C. § 1151 two issues that are irrefutably questions of federal law and ones reflecting an important national interest can the plaintiffs assert the right to regulate the tribe’s construction project in the first instance. See Oneida Indian Nation of New York State v. County of Oneida, New York, 414 U.S. 661, 668-70, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (holding that questions concerning the “possessory rights of Indian tribes to their aboriginal lands” arise under the Constitution, laws, or treaties of the United States within the meaning of 28 U.S.C. § 1331).
The majority, overlooking that the questions of whether Westwoods is “Indian land” and whether the Tribe holds aboriginal title to the land are obvious from the face of the complaint, focuses its attention only on the tribe’s defenses to regulation and the plaintiffs’ anticipation of those defenses. It may be that resolving whether Westwoods is Indian land or is held by aboriginal title is necessary also to the tribe’s defenses or anticipated defenses; nonetheless, if the State or the Town are going to exercise any right to regulate activities on the land, the resolution of those questions in the negative is absolutely necessary to resolving, the plaintiffs’ case-in-chief. By focusing on the tribe’s defenses instead of the complaint, the majority, inadvertently I am certain, ensures that every state or local enforcement action brought against an Indian tribe alleged to be occupying non-“Indian land,” whether commenced initially in federal court or commenced in state court and removed to federal court, will be dismissed for want of federal subject matter jurisdiction. The net effect is that the resolution of title to tribe-occupied lands at issue in those enforcement proceedings will necessarily be determined by a state court. Indian tribes in.New York, Connecticut, and *143 Vermont subject to state enforcement actions will no longer have the option of a federal forum to resolve those disputes regarding aboriginal title because, by virtue of the majority’s decision today, the federal courts are without jurisdiction to resolve them.
This result flies in the face of over 200 years of federal Indian law jurisprudence, which has evolved in large part to address and accommodate the historically thorny nature of tribal-state relations and a fear of “home-cooking” in state courts, particularly as to issues involving the assertion of state jurisdiction over Indian tribes. See Organized Village of Kake v. Egan, 369 U.S. 60, 71-75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) (surveying the evolution of “the relation[s] between the Indians and the States” over the course of United States history and the attendant metamorphosis of state jurisdiction over tribes). See also United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (describing the states as often the “deadliest enemies” of the tribes). Cf. Arizona v. San Carlos Apache Tribe of Arizona, 463 U.S. 545, 559 n. 10, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983) (describing legislative intent behind 28 U.S.C. § 1362, which provides original federal court jurisdiction over civil actions brought by Indian tribes, as “reflecting] a congressional policy against relegating Indians to state court when an identical suit brought on their behalf by the United States could have been heard in federal court”) (emphasis added).
For the foregoing reasons and those that follow, I respectfully dissent from the opinion of my colleagues that orders this case remanded to the state court for want of federal subject matter jurisdiction. Unlike my colleagues in the majority, I would hold that the plaintiffs’ have adequately pleaded a federal question sufficient to support removal of this action to federal court. Satisfied that we have jurisdiction, I would go on to address the more pressing, and frankly, more interesting issue in this case: the scope of tribal sovereign immunity. On that latter issue, I would hold that tribal sovereign immunity does not bar the instant suit, and I would affirm on the merits the detailed and well-reasoned decision of the district court.
A. Federal Question Subject Matter Jurisdiction
The majority misconstrues the tribe’s defense of sovereign immunity as the pertinent federal issue purporting to give rise to federal question jurisdiction. Majority Op. 138-39. I agree that the necessity of determining whether tribal sovereign immunity bars the action is not the basis upon which federal question jurisdiction arises in this case. Rather, federal question jurisdiction exists because the plaintiffs, in order to establish that they have any authority over the tribe’s activities at issue, must prove that Westwoods is not Indian land. The majority ignores the antecedent nature of this inquiry and overlooks that the plaintiffs’ authority to regulate the tribe’s activities on the Westwoods parcel necessarily turns on whether the tribe holds aboriginal title to the land in question and ultimately whether West-woods is Indian land — issues plainly arising under the laws of the United States.
In its complaint, the state affirmatively pleads that the tribe occupies and holds fee simple title to the land at issue; however, the state avers that the tribe’s property is “subject to the jurisdiction of New York State” and declares that it will prove, in order to prevail on its claims, that West-woods is not “Indian Country.” [1] J.A. 60, ¶¶ 45, 47. The state also pleads that: “the site of the planned casino is not ‘Indian *144 Country’ as defined in federal law and in [the] I[ndian] G[aming] R[egulatory] A[ct]”; and “the defendant’s property which is the subject of this action, the gaming site, does not constitute ‘Indian lands.’” J.A. 60, ¶47; J.A. 63, ¶76; J.A. 66 ¶ j. The Town, in its complaint, similarly pleads that the tribe is the fee simple owner of the land at issue. Complaint at ¶ 7, Town of Southampton v. The Shinnecock Tribe, 2:03-cv-03466 (TCP)(ARL) (E.D.N.Y. July 15, 2003), ECF No. 1-3.
Because the tribe owns and occupies Westwoods, making it prima facie Indian land, the plaintiffs’ right to relief — regulation of activities at Westwoods — necessarily depends on the resolution of a substantial question of federal law — is Westwoods “Indian land” within the meaning of 25 U.S.C. § 2703(4) and 18 U.S.C. § 1151.[2] See Franchise Tax Board, 463 U.S. at 27-28, 103 S.Ct. 2841. Indeed, unless the plaintiffs can demonstrate as part of their case in chief that Westwoods is not Indian land, their authority to regulate the tribe’s activities in this ease is a dead letter. See Cohen’s Handbook of Federal Indian Law § 6.03[1][a] (Nell Jessup Newton et al. eds., 2005) (“A state ordinarily may not *145 regulate the property or conduct of tribes or tribal-member Indians in Indian country.”) (citing The Kansas Indians, 72 U.S. 737, 5 Wall. 737, 18 L.Ed. 667 (1866); Worcester v. Georgia, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832); Okla. Tax Comm’n v. Sac & Fox Nation, 508 U.S. 114, 125, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993)).
The plaintiffs challenge the Tribe’s right to possession and use of the land in the manner the Tribe is proposing. This challenge is rooted in part on the State’s allegation that aboriginal title has been extinguished. It is axiomatic, however, that a tribe’s right of occupancy is “entitled to protection of federal law and with respect to Indian title based on aboriginal possession, the ‘the power of Congress ... is supreme.’ ” Id. at 669, 94 S.Ct. 772 (quoting United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941)). That being the case, a challenge to that right to occupancy is also governed by federal law and “could only be ... determined by the United States.” Id. at 668, 94 S.Ct. 772 (quoting Cramer v. United States, 261 U.S. 219, 227, 43 S.Ct. 342, 67 L.Ed. 622 (1923)). Accordingly, before reaching merits of the plaintiffs’ underlying state law claims, the court deciding this matter must first determine whether Westwoods is Indian land and is, therefore, subject to regulation in the first place. In short, in order to resolve the state’s claim that Westwoods is not Indian land, the court must initially determine if the tribe holds aboriginal title to West-woods — a substantial federal issue present on the face of the complaint.[3] Oneida, 414 U.S. at 670, 94 S.Ct. 772.[4]
The Supreme Court has determined that jurisdiction pursuant to section 1331 will be satisfied in actions arising under state law, such as the state regulatory enforcement- action here, where “the state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.” Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308, 314, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). Under the Supreme Court’s test in Grable, jurisdiction is satisfied because the determination of whether the tribe holds aboriginal title to Westwoods is an essential element of the state’s stated claims and an implicit *146 component of the Town’s right to regulation. If Westwoods is “Indian land” then the plaintiffs’ enforcement authority will not extend to the land in question. Thus, only by pleading that the tribe does not hold aboriginal title to Westwoods an issue of federal law that is actually in dispute by virtue of the tribe’s pre-suit ownership and occupation of Westwoods as if the tribe does hold Indian title can the state plead facially viable claims in the present case.
In Grable, the plaintiff sued to quiet title to real property that had been seized and sold by the IRS to satisfy the plaintiffs federal tax delinquency. 545 U.S. at 310, 125 S.Ct. 2363. The plaintiff argued that the tax sale to the defendant was invalid because the IRS had not given him (the plaintiff) valid notice as required by the federal statute governing IRS tax sales. Id. The defendant removed the case to federal court arguing that the plaintiffs state law quiet title action presented a federal question because the plaintiffs claim of title depended on an interpretation of federal law. Id. at 311, 125 S.Ct. 2363. The Supreme Court held that the plaintiffs state law claim arose under federal law for purposes of federal question subject matter jurisdiction because “[wjhether [the plaintiff] was given notice within the meaning of the federal statute is an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute.” Id. at 315, 125 S.Ct. 2363.
Here, as in Grable, federal law is not “precluding” or “providing” the state’s causes of action, but rather informing whether the plaintiffs may assert jurisdiction over Westwoods. And so, pursuant to the analysis set out in Grable, there is federal subject matter jurisdiction over the enforcement action before us because, at the very least, the plaintiffs must demonstrate, as part of their case-in-chief, that Westwoods is not Indian land in order to assert any regulatory authority over the tribe’s activities at that site. See also Oneida, 414 U.S. at 678, 94 S.Ct. 772 (finding that “the assertion of a federal controversy does not rest solely on the claim of a right to possession derived from a federal grant of title whose scope will be governed by state law. Rather, it rests on the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession.”).
Moreover, in Grable the Supreme Court identified a number of considerations a district court should weigh in determining whether the underlying federal issue is one 'of national importance: (1) the issue is one that “sensibly belongs in federal court;” (2) the issue “appears to be the only legal or factual issue contested in the case;” (3) there exists an important national interest in providing a federal forum for adjudicating the dispute; and (4) there is a risk that recognizing federal jurisdiction under the circumstances would disrupt federal-state comity. 545 U.S. at 315, 125 S.Ct. 2363. Each of the Grable considerations is present in this case and inform my view that the district court properly held that it had federal subject matter jurisdiction over the instant matter.
Whether the tribe holds aboriginal title to Westwoods is “an important issue of federal law that sensibly belongs in federal court.” Id. at 315, 125 S.Ct. 2363. The issue of aboriginal title and therefore the propriety of state and local regulation over that land “appears to be the only legal or factual issue contested in the case.” Id. There is also an important and historic interest in providing Indian tribes with a *147 federal forum for adjudicating their land disputes with states, and the risk that recognizing federal jurisdiction over this case will open the floodgates for cases involving state casino permitting disputes is minimal at best. See id. In sum, whether Westwoods is Indian land is an important national issue that has historically and routinely been resolved by federal courts and is a question that must be resolved before reaching all other aspects of the state’s case. See generally McClanahan v. State Tax Comm’n of Ariz., 411 U.S. 164, 168-69, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (emphasis added) (“ ‘The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation’s history.’” Rice v. Olson, 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945)). “This policy was first articulated by this Court 141 years ago when Mr. Chief Justice Marshall held that Indian nations were ‘distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied [sic] by the United States.’ ” McClanahan, 411 U.S. 164 at 168, 93 S.Ct. 1257 (citing Worcester v. Georgia, 6 Pet. 515, 557, 8 L.Ed. 483 (1832)). Because “there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart” of this case, Grable, 545 U.S. at 319-20, 125 S.Ct. 2363, I would hold that federal question subject matter jurisdiction exists and that the case may not be dismissed on that basis.
B. Tribal Sovereign Immunity
Having found subject matter jurisdiction, the next issue to decide is whether the Tribe enjoys tribal sovereign immunity from suit. The Tribe asserts it is immune from these consolidated actions on that basis and that tribes generally enjoy sovereign immunity from suit in all cases unless Congress or the tribe waives such immunity.
The Tribe’s understanding and interpretation of tribal sovereign immunity is wholly derived from the Supreme Court’s decision in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). It is from Kiowa that Indian law jurisprudence has derived the dual propositions that, first, there is a distinction between a tribe’s sovereign authority over its tribal lands on the one hand and tribal sovereign immunity from suit on the other and, second, that congressional or tribal waiver is always necessary to defeat such tribal immunity from suit. While these propositions have gained some traction, it is important to note the holding in Kiowa is actually narrower than its legacy would suggest: “Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.” Id. at 760, 118 S.Ct. 1700 (emphasis added). Indeed this pronouncement in Kiowa on the scope of tribal sovereign immunity, as applied to the particular facts at issue in that case, refers only to cases involving contractual disputes. There is nothing in the factual record of Kiowa that would require the holding be extended to suits by states seeking prospective relief against a tribe. Moreover, at least one of our sister circuits has held, to that same effect, that tribal sovereign immunity as set forth in Kiowa does not apply to suits seeking injunctive relief against the tribe. TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676, 680-81 (5th Cir.1999) (distinguishing Kiowa as a suit for money damages and holding that tribal sovereign immunity did not extend to suits for prospective relief); see also Comstock Oil & Gas v. Alabama & Coushatta Indi *148 an Tribes of Texas, 261 F.3d 567, 571-72 (5th Cir.2001) (reaffirming that in the Fifth Circuit tribes are not entitled to sovereign immunity from claims seeking prospective relief).
While it would be tempting to halt the analysis of Kiowa and tribal sovereign immunity at this juncture, follow the sound rationale of the Fifth Circuit in TTEA and declare that tribal sovereign immunity does not bar New York’s suit seeking prospective relief against the tribe for commercial activities occurring in violation of state regulations on non-Indian land,[5] the more expansive language in Kiowa purports to extend the scope of tribal sovereign immunity farther. Whether Kiowa actually supports the tribe’s proposition that there is tribal sovereign immunity from the relief New York seeks in this case thus warrants further discussion.
Prior to Kiowa, tribal sovereign immunity, and the attendant need for congressional or tribal waiver in order to overcome it, depended on the answers to the following questions: (1) whether the tribal conduct at issue involved self-governmental or commercial activities; and (2) if the conduct involved commercial activities, whether those activities were occurring on or off the tribe’s reservation. Mescalero Apache Tribe v. Jones (“Mescalero”), 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). If the tribe’s activities involved either (a) matters of self-government, whether occurring on- or off-reservation or (b) on-reservation commercial conduct, then congressional or tribal waiver of tribal sovereign immunity was necessary to be able to assert regulatory control over and to pursue an action against the tribe with respect to that activity. Id. at 148, 93 S.Ct. 1267. If, however, the tribe engaged in off-reservation commercial activities, then a state had the authority to enforce its laws against a tribe operating outside the boundaries of its reservations for all purposes unless Congress “expressly forbade it.” Id. at 148-51, 93 S.Ct. 1267.
This framework governed questions of tribal sovereign immunity until the Supreme Court’s issued its decision in Kiowa in 1998. Kiowa involved a dispute between the Kiowa Tribe of Oklahoma and Manufacturing Technologies, Inc., which had loaned the tribe $285,000. 523 U.S. at 753,118 S.Ct. 1700. The tribe subsequently defaulted on the promissory note, which expressly recited it had been signed on tribal land. Id. at 753-54, 118 S.Ct. 1700. When the company sued the tribe in state court for breach of contract, the tribe moved to dismiss for lack of jurisdiction on the ground of tribal sovereign immunity. Id. at 754, 118 S.Ct. 1700. The Oklahoma state courts held that the tribe was subject to suit in state court for breach of contract involving off-reservation commercial conduct. Id. The U.S. Supreme Court reversed, holding the tribe was protected from suit as a result of tribal sovereign immunity. Id. at 760, 118 S.Ct. 1700. In reviewing the scope of tribal sovereign immunity, the Supreme Court noted that “tribal immunity extends beyond what is needed to safeguard tribal self-governance” and declined to confine tribal sovereign immunity to “reservations or to noncommercial activities.” Id. at 758, 118 S.Ct. 1700. Sovereign immunity thus protected the tribe from the breach of contract suit. It is worth noting that in Kiowa the language of the promissory note stated that “[njothing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma,” indicating *149 the lender was on notice that the tribe had a potential sovereign immunity defense and still did not see fit to negotiate to have that reservation of immunity removed from the language of the contract. As the lender was the one disbursing the funds and was therefore in presumptive control of the contractual terms, it is not difficult to understand why the Court was inclined to hold the lender to the terms of the contract.
Before reaching its holding, however, Kiowa unnecessarily split its analysis of tribal sovereign immunity into two separate concepts tribal sovereign immunity from suit and tribal sovereign immunity from state oversight more generally. That is, “[t]o say substantive state laws apply to off-reservation conduct ... is not to say that a tribe no longer enjoys immunity from suit.... There is a difference between the right to demand compliance with state laws and the means available to enforce them.” Id. at 755, 118 S.Ct. 1700. The Court further stated that this immunity from suit always required congressional abrogation or tribal waiver. Id. at 760, 118 S.Ct. 1700. That legacy lives on as demonstrated by this circuit’s now-vacated decision in Oneida Indian Nation of New York v. Madison Cnty., New York, 605 F.3d 149, 156 (2d Cir.2010) (noting the existence of “two distinct doctrines: tribal sovereign authority over reservation lands and tribal immunity from suit”) vacated by Madison Cnty., New York v. Oneida Indian Nation of New York, — U.S.-, 131 S.Ct. 704, 178 L.Ed.2d 587 (2011), remanded to Oneida Indian Nation of New York v. Madison Cnty., 665 F.3d 408 (2d Cir.2011). As explained in more detail below, it was not necessary to the outcome reached in Kiowa to split the concept of general tribal sovereign immunity from the concept of tribal sovereign immunity from suit. The holding that the tribe in Kiowa enjoyed immunity from a suit seeking money damages arising from breach of a contract that had been executed on tribal land, i.e., commercial activity occurring on tribal land, did not depend to any degree on having to draw a distinction between general tribal sovereign immunity and immunity from suit.
Simply put, Kiowa’s cleaving of tribal sovereign immunity was a departure from previous precedents, which had not split the concept of tribal sovereign immunity into two parts. More specifically, the precedents upon which Kiowa purported to rely do not support the notion that tribal immunity from suit is distinct from tribal sovereign authority over its lands and people. Furthermore, this cleaving of tribal sovereign immunity went beyond what was necessary for the Court to reach the holding it did in Kiowa. And so, the legacy of Kiowa is at once both unnecessary dictum and without sound support in prior precedents.
Turning to Kiowa, the Court stated first that an Indian tribe is subject to suit only if it has waived its immunity or Congress has authorized the suit, citing Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); and United States v. United States Fidelity & Guaranty (“USF & G”), 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940). Kiowa, 523 U.S. at 754, 118 S.Ct. 1700. In those three particular cases, however, congressional or tribal waiver was necessary because the conduct at issue in each case involved matters of tribal self-governance over either its tribal members or its tribal land. In other words, by then-very nature the cases cited do not support the proposition that such waiver or congressional authorization was necessary in every case involving an Indian tribe be *150 cause those three cases involved only issues of self-governance and did not involve circumstances where the tribe’s commercial activities were occurring off-reservation.
USF & G involved an effort by the United States, on behalf of two Indian tribes, to collect royalties from a mining company pursuant to a lease between the tribes and a mining company that permitted coal mining on tribal lands. 309 U.S. at 510, 60 S.Ct. 653. When the mining company declared bankruptcy, it went on to claim back against the tribes for credits exceeding the value of the royalties. Id. The issue was whether the bankruptcy court had jurisdiction to hear that cross-claim against the tribes because, although Congress had waived the tribe’s immunity for claims arising out of the leases, that waiver was limited to suits brought in “any United States court in the Indian Territory,” a waiver that did not encompass the bankruptcy court hearing the cross-claim. Id. at 513, 60 S.Ct. 653. The Court held that the tribe’s immunity was intact and barred the mining company’s claim, noting that “[t]he sovereignty possessing immunity should not be compelled to defend against cross-actions away from its own territory or in courts, not of its own choice, merely because the debtor was unavailable except outside the jurisdiction of the sovereign’s consent.” Id. In other words, finding no congressional waiver permitting suit against the tribe in that particular court for disputes arising out of the lease — that is, for activities which were occurring on tribal lands — the Court held that the tribe retained its sovereign immunity and acted to bar the claim. Id. at 515, 60 S.Ct. 653.
In Santa Clara Pueblo, a female member of the tribe sought injunctive and declaratory relief against enforcement of a tribal ordinance denying tribal membership to the children of female members who married outside the tribe while extending tribal membership to children of male members who married outside the tribe. 436 U.S. at 51, 98 S.Ct. 1670. Noting the tribe’s sovereignty in matters of “self-government,” which provided the tribe with the authority to regulate their “internal and social relations” free from outside influence, id. at 55, 98 S.Ct. 1670 (quoting United States v. Kagama, 118 U.S. 375, 381-82, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)), the Court reasoned that where the subject matter at issue involved aspects of the tribe’s internal self-government, the tribe had sovereign immunity from suit absent a waiver of such immunity by the tribe or Congress, id. at 58, 98 S.Ct. 1670. Finding no such waiver, the Court held that the suit was barred by tribal sovereign immunity. Id. at 72, 98 S.Ct. 1670.
In Three Affiliated Tribes, the underlying dispute involved the tribe’s attempt to sue for breach of contract and negligence in state court the company that had constructed a water-supply system on the tribe’s reservation. 476 U.S. at 878, 106 S.Ct. 2305. The Supreme Court addressed the issue of whether the state of North Dakota could condition the tribe’s right to seek relief in state court for that dispute on the tribe’s agreeing to waive immunity from all civil suits against it and to have any civil suit brought in state court adjudicated under state law, not tribal law. Id. North Dakota maintained that the tribe could access the state court system only by first agreeing to the blanket waiver of immunity and to having its tribal laws regarding marriage, divorce, child custody, and the like, preempted by analogous state laws. Id. at 889, 106 S.Ct. 2305 (“The North Dakota jurisdictional scheme requires the Tribe to accept a potentially severe intrusion on the Indians’ ability to govern themselves according to their own *151 laws in order to regain their access to the state courts.”) (emphasis added). The Court concluded that the requirement that the tribe submit to state oversight “even in cases that arise on the reservation, that involve only Indians, and that concern subjects which are within the jurisdiction of the tribal court” contradicted traditional notions of Indian sovereignty, noting that “ ‘[a] tribe’s power to prescribe the conduct of tribal members has never been doubted, and our cases establish that absent governing Acts of Congress, a State may not act in a manner that infringes on the right of reservation Indians to make their own laws and be ruled by them.’ ” Id. at 890, 106 S.Ct. 2305 (emphasis added) (quoting New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 332, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (internal quotation marks and alterations omitted)).
These three cases on which Kiowa relied to pronounce broadly that congressional or tribal waiver is always necessary each involved attempts to impede or infringe on the tribes’ privileges of self-government over its tribal members or involved commercial activities occurring on tribal land. And while the issue of tribal or congressional waiver would necessarily arise under such circumstances, it does not follow that such a waiver is required in other contexts where the tribe could not reasonably be said to be exercising any “sovereign authority,” i.e., outside the boundaries of its tribal lands in matters not involving issues of internal tribal self-governance.
In stating that “our cases have sustained tribal sovereign immunity from suit without drawing a distinction based on where the tribal activities occurred,” 523 U.S. at 754, 118 S.Ct. 1700, Kiowa also did not credit those locational factors bearing on the Court’s analyses in its earlier cases. The only case it cited for this latter proposition is Puyallap Tribe, Inc. v. Department of Game of the State of Washington (“Puyallap III’), 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). That case, which at that time was well into its second decade and had already been heard before the Supreme Court twice, involved Washington State’s attempts to regulate the fishing activities of tribal members along the Puyallap River. In Puyallap Tribe v. Department of Game of Washington (“Puyallap I”), 391 U.S. 392, 398, 400-01, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), the Supreme Court held that a treaty guaranteeing the right of tribe members to fish on- and off-reservation did not foreclose the state’s ability to regulate such fishing, on- and off-reservation, for conservation purposes. Of significance to the issue of tribal sovereign immunity, the Puyallap I Court characterized the suit as “a suit to enjoin violations of state law by individual tribal members fishing off the reservation,” a characterization that did not implicate issues of the tribe’s sovereign immunity. Id. at 396 n. 11, 88 S.Ct. 1725. The case was remanded to the state court to determine whether the state’s total ban on net fishing was a necessary conservation measure. Id. at 401-02, 88 S.Ct. 1725. In Washington Game Department v. Puyallap Tribe (“Puyallap II”), 414 U.S. 44, 48-49, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973), the Supreme Court reversed the state court’s decision upholding the ban on net fishing and remanded to establish a fair fishing quota between Indian net fishing and non-Indian sport fishing; the issue of tribal sovereign immunity, however, was not addressed.
Puyallap III involved a challenge to the state court’s order regarding the number of trout the tribal members could catch with nets. 433 U.S. at 167, 97 S.Ct. 2616. In that order, the state court said it had “jurisdiction to regulate the fishing activities of the Tribe both on and off its reservation” and to set the number of fish that *152 the tribe could catch with nets each year. The state court directed the tribe “to file a list of members authorized to exercise treaty fishing rights” and to report the number of trout caught each week to the state’s Department of Game and the court. Id. On appeal to the Supreme Court, the tribe objected to the order, arguing that “the state courts of Washington [were] without jurisdiction to regulate fishing activities on its reservation.” Id. (emphasis added). The Supreme Court held that the tribe’s sovereign immunity barred the state court’s exercise of jurisdiction over the tribe absent waiver or consent from the tribe or Congress. Id. at 172-73, 97 S.Ct. 2616. The Court concluded, however, that the state court did have jurisdiction over the individual tribal member defendants to “decide questions relating to the allocation between the hatchery fish and the natural run, the size of the catch the tribal members may take in their nets, their right to participate in hook-and-line fishing without paying state license fees and without having fish so caught diminish the size of their allowable net catch, and like questions,” both on and off the reservation. Id. at 173, 97 S.Ct. 2616. In other words, while the state could regulate individual members of the tribe, tribal sovereign immunity precluded the state court from ordering the tribe to report to the state: (a) which members of its tribe were authorized to exercise the treaty fishing rights and (b) the weekly catch amounts of its tribal members. Id. at 178, 97 S.Ct. 2616. Problematically, the state court’s order had sanctioned state interference with the tribe’s relationship and oversight of its members. Puyallap III, therefore, does not support Kiowa’s blanket proposition that tribes enjoy immunity from suit “without drawing a distinction based on where the tribal activities occurred.” 523 U.S. at 754, 118 S.Ct. 1700 (emphasis added). Rather Puyallap III, in line with the other precedents discussed above, at most held the state had no authority, absent congressional or tribal waiver, to direct the tribe’s oversight of tribal members, i.e., to interfere with the tribe’s right of self-governance.
Citing Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma (“Potawatomi”), 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), and USF & G, 309 U.S. 506, 60 S.Ct. 653, Kiowa stated that the Court had never “drawn a distinction between governmental and commercial activities of a tribe” when determining whether the tribe had sovereign immunity from suit. 523 U.S. at 754-55, 118 S.Ct. 1700. Although it is correct that in Potawatomi and USF & G the tribes engaged in commercial activities and non-governmental activities, Kiowa overlooked the salient point of those cases — that the commercial activities in each case were occurring on the reservation. In USF & G, 309 U.S. at 510, 60 S.Ct. 653, the tribe had leased out its tribal land for coal mining activities, and in Potawatomi, 498 U.S. at 507, 111 S.Ct. 905, the tribe was selling cigarettes on tribal land.
Ignoring that Puyallap III involved interference with the tribe’s prerogative of self-governance and that USF & G and Potawatomi involved on-reservation commercial activities, Kiowa stated incorrectly that “[t]hough respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions.” 523 U.S. at 755, 118 S.Ct. 1700. In fact, the very precedents on which Kiowa relied yield the following formulation for the applicability of tribal sovereign immunity: tribal sovereign immunity, and the attendant need for congressional or tribal waiver in order to overcome it, applies in cases involving (1) *153 interference with matters of tribal self-governance, whether on- or off-reservation (Santa Clara Pueblo, Three Affiliated Tribes, and Puyallap III), or (2) commercial activities occurring on-reservation (USF & G and Potawatomi).
That leads to an analysis of the final category of cases, i.e., those involving óffreservation commercial activities. As set forth in Mescalero, 411 U.S. at 148-49, 93 S.Ct. 1267, which affirmed the state’s right to collect taxes on a tribe’s activities at its off-reservation commercial ski resort, “absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-diseriminatory state law. otherwise applicable to all citizens of the State.” Here as well, Kiowa mixed and matched the pertinent precedent, cleaving the notion of tribal sovereign immunity into two separate concepts. Kiowa acknowledged that “[w]e have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country.” 523 U.S. at 755, 118 S.Ct. 1700 (citing Mescalero, 411 U.S. at 148-49, 93 S.Ct. 1267 and Organized Village of Kake v. Egan, 369 U.S. 60, 75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) (declaring that “State authority over Indians is yet more extensive over activities ... not on any reservation”)). But at odds with both Mescalero and Potawatomi, the Kiowa court then concluded that “[t]o say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit.” 523 U.S. at 755, 118 S.Ct. 1700 (citing Potawatomi 498 U.S. at 510, 111 S.Ct. 905).
In Mescalero, the tribe operated an off-reservation ski resort in New Mexico. 411 U.S. at 146, 93 S.Ct. 1267 (“[N]o part of the enterprise, its buildings or equipment is located within the existing boundaries of the reservation.”). The state then asserted its right to impose a tax on the ski resort’s gross receipts and to impose a use tax on certain ski lift equipment purchased outside the state and used in connection with operating the resort. Id. In seeking a refund on the tax it had already paid and in protesting the state’s use tax assessment, the tribe argued that the ski resort’s income and property were not subject to state taxation. Id. The land itself, having been acquired through a congressional act, was exempt from state property tax; the issue, however, was whether that property tax exemption extended to the use of the land. Id. at 155, 93 S.Ct. 1267. Drawing a distinction between states’ efforts to enforce revenue laws against on- and off-reservation tribal enterprises, the Court noted that for on-reservation conduct, the state had to have “congressional consent” before it had any authority to tax “Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation.” Id. at 148, 93 S.Ct. 1267 (citing McClanahan v. State Tax Comm’n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)). Off-reservation activities, however, were a different story. Id. (“[Tjribal activities conducted outside the reservation present different considerations.”). Noting that state authority was “more extensive” over off-reservation tribal activities, id. (quoting Organized Village of Kake, 369 U.S. at 75, 82 S.Ct. 562), the Court held that “[ajbsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State,” id. at 148-49, 93 S.Ct. 1267. In other words, in Mescalero the location of the tribe’s activities was the deciding factor in determining the state’s ability to enforce its laws against the tribe be they tax laws or criminal laws or otherwise. Id. Whereas a state’s ability to reg *154 ulate a tribe’s on-reservation activities depended on a congressional or tribal waiver of the tribe’s sovereign immunity, for off-reservation activities the opposite was true, that is, a state retained its authority to regulate a tribe unless Congress “forbade it.” Id. Finding no congressional authority exempting the tribe’s off-reservation “business enterprise” activities from state taxes, the Court held that the ski resort’s gross receipts were subject to state taxes.[6] Id. at 157-58, 93 S.Ct. 1267. Specifically, the Court held that there was nothing in the statute to “bar the collection of New Mexico’s nondiscriminatory gross receipts tax and that the Tribe’s ski resort is subject to that tax.” Id. At no point did the Court state, hold, or otherwise indicate that, in the future, the state of New Mexico would be prohibited from collecting the tax because the tribe enjoyed some sort of immunity from suit. The Court stated in Kiowa that “[t]o say that substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit.” Kiowa, 523 U.S. at 755, 118 S.Ct. 1700. That pronouncement, however, begs the question why the Mescalero Court held that New Mexico was permitted to collect the disputed tax. Mescalero, 411 U.S. at 158, 93 S.Ct. 1267 (“We therefore hold that the exemption [for property taxes in the relevant statute] does not encompass or bar the collection of New Mexico’s nondiscriminatory gross receipts tax and that the Tribe’s ski resort is subject to that tax.”) (emphasis added). According to Kiowa’s logic, the Mescalero Court should have acknowledged New Mexico’s right to collect the tax but then prohibited the state from actually collecting the tax based on the tribe’s immunity from suit moving forward. Mescalero, however, proceeded to the merits, and the Court held that the state was entitled to collect the gross receipts tax from the tribe hardly an imprimatur for the exercise of tribal immunity from suit. Mescalero thus does not support Kiowa’s pronouncement that states cannot exercise their authority over tribe’s off-reservation activities without first getting congressional or tribal waiver of immunity from suit.
Kiowa goes on to observe that it was not unusual for states to be left with a right but no remedy, citing Potawatomi for the proposition that there is a “difference between the right to demand compliance with state laws and the means available to enforce them.” 523 U.S. at 755, 118 S.Ct. 1700 (citing Potawatomi, 498 U.S. at 514, 111 S.Ct. 905). Potawatomi, however, involved on-reservation activities and thus, is not in conflict with Mescalero, which involved off-reservation activities. In Potawatomi, the tribe filed suit in federal court seeking an injunction against Oklahoma’s efforts to collect taxes on the sale of cigarettes on Indian land. 498 U.S. at 507, 111 S.Ct. 905. The Court first determined that the tribe was operating its convenience store on land “that qualifie[d] as a reservation for purposes of tribal sovereign immunity.” Id. at 511, 111 S.Ct. 905. This was an important step in the Court’s analysis because, as the Court explained, there was a distinction between the extent of a state’s authority depending on whether the tribal activities were occurring on- or off-reservation. The Court noted, regarding on-reservation activities, that Congress had never authorized suits to enforce tax assessments. Id. at 510, 111 S.Ct. 905. Regarding off-reservation ac *155 tivities, however, the Court reiterated the holding from Mescalero that “ ‘absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.’ ” Id at 511, 111 S.Ct. 905 (quoting Mescalero, 411 U.S. at 148-49, 93 S.Ct. 1267). Because the activities at issue in Potawatomi were occurring on the reservation, and given the lack of congressional or tribal waiver, the tribe’s sovereign immunity barred the tax assessment suit. Id
The confusion regarding Potawatomi arises because the Court in Potawatomi further held that tribal sovereign immunity did not excuse the Potawatomi tribe from “all obligations to assist in the collection of validly imposed state sales taxes,” which included sales to nonmembers of the tribe. Id at 512, 111 S.Ct. 905. According to the Potawatomi Court, 498 U.S. at 513, 111 S.Ct. 905, that obligation derived from two prior Supreme Court cases Washington v. Confederated Tribes of Colville (“Colville”), 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). “[Colville and Moe ] stand for the proposition that the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the tribe.” 498 U.S. at 513, 111 S.Ct. 905. Thus, in Potawatomi, while the tribe was entitled to sovereign immunity from suit because of where its activities were occurring, that sovereign immunity did not technically absolve the tribe from its obligation, established in prior Supreme Court cases, to collect sales taxes from nonmembers. Id. Oklahoma was left, therefore, with a right without a remedy because the cigarette sales to nonmembers were occurring on tribal land. That is, the tribe’s sovereign immunity from suit ran with the land. On its facts, therefore, Potawatomi does not support the proposition that there is separate “immunity from suit” that exists beyond the boundaries of the tribe’s reservation and that is separate and apart from the tribe’s traditional sovereign immunity which derives from the sovereignty it maintains over its tribal lands. Kiowa, 523 U.S. at 755, 118 S.Ct. 1700 (citing Potawatomi, 498 U.S. at 510, 514, 111 S.Ct. 905, when stating “[tjhere is a difference between the right to demand compliance with state laws and the means available to enforce them”).
In sum, prior to Kiowa, it could be fairly said that, unless Congress dictated otherwise, a state could enforce its non-discriminatory laws against tribal activities occurring beyond the bounds of the reservation, so long as such activities were not intimately related to tribal self-governance. If, on the other hand, the state or a private party sought to enforce its laws or contractual rights on tribal lands, it needed to have congressional or tribal waiver of sovereign immunity. Kiowa, limited to the facts on which its holding rests, is not to the contrary: the party that sought to enforce a contract — that arguably involved on-reservation conduct because it was executed on the reservation — was barred from suing the tribe for breach of contract because the tribe had not waived its tribal sovereign immunity. Id. at 760, 118 S.Ct. 1700. Kioiva’s broader sweeping pronouncements beyond those necessary to resolve the issue in dispute in that case— i.e., that a tribe’s sovereign immunity from suit is a separate concept from general sovereign immunity over a tribe’s lands and issues of self-governance and that the only way to overcome this distinct type of sovereign immunity from suit is to obtain *156 congressional or tribal waiver — were unnecessary to the Court’s holding. In a word, they are dicta.
In the case before us, the state and the town are seeking to enforce their laws against the tribe’s off-reservation commercial activities. For the plaintiffs to be able to do so, there is no need for a congressional or tribal waiver of sovereign immunity. As the tribe has not shown and cannot show that Congress has expressly forbidden the exercise of state and local authority at issue here, in my view tribal sovereign immunity does not bar the instant actions against the tribe.
C. The Merits
Having concluded that there is federal question subject matter jurisdiction and that the Tribe is not entitled to tribal sovereign immunity from suit in this case, I would affirm the district court’s well-supported analysis concluding that the historical record demonstrates the Tribe’s aboriginal title to Westwoods was extinguished in the 17th century and that, in the absence of aboriginal title, the Tribe is subject to the application of state and local laws. Shinnecock, 523 F.Supp.2d at 188-89. Accordingly, I would affirm the district court’s grant of a permanent injunction barring the Tribe from constructing a casino on the Westwoods parcel not in compliance with state and local laws and regulations. Id. at 190.

. In examining and deciding this issue below, the district court held that the state had the *144 burden of proving at trial that the tribe's aboriginal title had been extinguished. State of New York v. Shinnecock Indian Nation, 523 F.Supp.2d 185, 256 (E.D.N.Y.2007). As the district court noted, "it is undisputed that the Nation had aboriginal title at the time of initial discovery in 1640.” Id. Because the slate was "questioning Indian title and arguing aboriginal title has been extinguished,” the district court concluded that "the burden lies with [the state].” Id. at 257. As noted by the Majority, the district court's burden of proof analysis relied on 25 U.S.C. § 194 and shifted the burden to the state to prove the extinguishment of aboriginal title. Maj. Op. 140 n. 4. In Wilson v. Omaha Indian Tnbe, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) the Supreme Court made clear that a sovereign state is a not a "white person” for section 194 purposes, and, therefore in a trial concerning property rights in which title to the property at issue is presumptively held by an "Indian,” the sovereign state does not axiomatically bear the burden of proof. Not addressed by the majority is that the burden shifting mandated by section 194 continues to apply to the other plaintiff in this case — the Town of Southampton. See Oneida Indian Nation of New York v. City of Sherrill, New York, 145 F.Supp.2d 226, 242 (N.D.N.Y.2001) (citing Wilson and section 194 in support of placing burden on the municipality), aff d in pan, vacated and remanded on other grounds 337 F.3d 139 (2d Cir.2003), rev’d and remanded 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005); see also Monell v. New York City Dept. of Social Svs., 436 U.S. 658, 688-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that municipal corporations are "persons” within the meaning of 42 U.S.C. § 1983). Thus, notwithstanding the majority's assertion to the contrary, there is no question that the district court correctly applied section 194 to the Town. In any event, putting aside the issue of which party bears the ultimate burden of proving extinguishment of aboriginal title, the plaintiffs in this action assert a right to regulate land that is presumptively beyond their regulatory purview and therefore, the onus is on the plaintiffs to demonstrate, in the first instance, that they have the authority to regulate activities on the tribe’s land.

. 25 U.S.C. § 2703(4) defines "Indian lands” as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States government against alienation and over which an Indian tribe exercises governmental powers.” 18 U.S.C. § 1151 defines such lands as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.”

. With due respect to the majority, that this federal issue is necessary to the resolution of the plaintiffs' claims is beyond cavil. The majority proffers that the district court could have resolved the case without needing to reach whether Westwoods is Indian land because the court may have determined that the tribe’s casino project was in compliance with state and local laws. Majority Op. at 140-41. On the record in this case, that hypothesis has no legs on which to stand. The tribe’s Answer to the Complaint admits that it had not applied for nor received any construction permits or zoning variances for its casino project. J.A. 87-88, ¶¶ 53-54, 58-59. In this case, a trial court could never have held that the tribe was in compliance with the applicable state and local laws, and therefore the court would be required to reach the issue whether the tribe holds aboriginal title to Westwoods. Our jurisdictional analysis should focus on the facts of the matter before us and not on an inapposite hypothetical.

. To the extent that the majority distinguishes the finding of jurisdiction in Oneida from the instant case, the majority overlooks that the Oneida court found multiple bases satisfying federal subject matter jurisdiction. Majority Op. at 141-42. The first, the existence of a possessory land claim by a tribe in the complaint; the second, "the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands....” The Supreme Court also found jurisdiction under 25 U.S.C. § 233. Oneida, 414 U.S. at 680, 94 S.Ct. 772

. Based on the district court's well-reasoned and sound opinion, I would affirm the district court's decision that the Tribe’s aboriginal title was extinguished and therefore West-woods is no longer “Indian land.”

. The Court reached the opposite conclusion with respect to the use tax imposed in connection with the construction of the ski lifts, reasoning that they were improvements to the land and thus were subject to the tax exemption that ran with the land under the statute. Id. at 158, 93 S.Ct. 1267.